Whyte, J.
For the Mr. Morgans, it is argued, that , the marriage settlement is cancelled by the act ot the trustee, Hamblin, in cutting out his name, signed thereto in its execution by him as a party, by which the property, the subject matter of the deed, has revested in the wife, Mrs. Elam, and consequently, simultaneously in the husband, under his marital rights by the common law. To prove this marriage settlement cancelled by this act of the trustee, and the property therein specified revested in Mrs. Elam, Bl. Com. 108, and 4 Cruise’s Dig, 497, 498, 414, and Sugden on Powers, 400, are cited and relied upon. These authorities when looked into, will be found not to support the position. Blackstone says, <£a deed maybe avoided by breaking off or defacing the seal, or by delivering it up to be cancelled. ” He is here laying down the different ways by which a deed may be avoided by matter arising ex post facto to its execution; and the above are two of those ways; the others are not noticed here, as they have no bearing on the present case. This expression of the author, that a deed may be avoided by breaking off or defacing the seal, and by delivering it up to be cancelled, is general, and seems ex vi tcrminorum, to extend to all cases where those acts have existence. Separately, and in this light, it is viewed in the argument, to wit, that a deed is avoided and rendered a nullity, either by breaking off or defacing the seal, or by delivering the deed up to be cancelled, without reference to the subject matter of the deed. Such is not the learned author’s meaning in the above passage, and reference to his authorities proves it. His view is limited and circumscribed by the boundaries of the case to which he has so referred in his work. That case is Matthewson’s case, 5 Coke, 23. That was a case on a Charter party, between a merchant, .the owner of a ship of the one part, and seven merchants of the other part. The máster and owner covenanted on his part, to ship certain merchandizes, at such a port beyond seas, and *412 transport them to London, and the merchants covenanted separately, to pay each three hundred pounds. Debt was brought against one of the merchants on the instrument, to which the defendant pleaded, that the seal of another of the merchants fixed to said indenture, was broken from the deed. To which the plaintiff demurred. And it was remarked, that if the seal of one of the merchants be broken off, it should not avoid the deed, but only against him; that if the seal of the master and owner had been broken from the deed, all their covenants had been defeated; because their covenants had been joint. And if the deed' had been rased in the date, after delivery, it had gone to the whole, and judgment accordingly. Such is the case in Coke, upon which the doctrine in Bl. Com. is predicated, and may be good law, but has no similarity to the case before the court; it is wholly different. It is not a case purporting to transfer specific property, real or personal, as the case before the court, but a case of a deed of covenants, resulting in liabilities to be discharged in peculiar indemnities and undertakings according to the event.
The purport of the two other authorities cited by the counsel for the Messrs Morgans, are of the same nature of that from Bl. Com. Sugden on Powers, 400, says, if an instrument be altered by rasure or otherwise, in a material part, by the person for whose benefit it was intended, the deed becomes absolutely void; and he refers to Whelpdale’s case, 5 Coke, 119 a. The extent of the citation will be measured by reference to the case cited. Whelpdale’s case was an action of debt, brought on a bill obligatory. The defendant pleaded non est factum. The jury found the bill was a joint bill made by defendant and another, to plaintiff, and prayed the advice of the court on the matter, whether the bill was the deed of the defendant. It was adjudged that plaintiff recover. There are three resolutions by the court in this *413 case. In tbe third resolution is the following passage, on account of which, reference is made by Sugden,
“In all cases, when the bond was once his deed, and becomes rased either by rasure or addition, or other alteration of the deed, or breaking off the seal, in this case, although it was once his deed, yet the defendant may safely plead non est factum. For, without question at the time of the plea, which is in the present tense, it was not his deed.” Now the purport of this case is precisely the same as Matthewson’s case above noticed; the case itself is a writing obligatory j and the doctrine in the third resolution is predicated on a bond; for it says, “In all cases, where the bond was once his deed,” &c. as properly confining what follows after, to the case of bonds. The authority from 4 Cruise’s Dig. 497, sec. 14, is of the same purport, as those from Blackstone and Sugden. And although the expression is general, yet like them, the true meaning and extent embraces bpnds only, and perhaps extends not to every kind of them. Certainly not to such deeds as the marriage settlement in the present case, which upon its execution, passed a present estate in the property comprised within it. This is proved by the next following section, 15, which is incompatible with the allowance of a more extended signification to the 14th section than that now assigned to it. It is in the words following: “but when an estate actually passed by a deed, the cancelling of such deed after-wards, will not divest any estate out of the persons in whom they were vested by that deed.” Vide also, C. D. p. 11, s. 29, 60: p. 94, s. 41, 42, 43: p. 147, s. 22: 10 Johnson’s Rep. 467, 461-2. I take this 15th section to be a correct summary of the law, in relation to deeds passing estates, both in real and personal property; and is supported by the most respectable authorities, both’ in England and in the United States.
Admitting this principle to be correct, that the cancellation of the deed passing an estate, does not divest the *414 estate passed out of the grantee and reinvest the grantor , 1, . , , therewith, it ceases to be important to examine whether the deed of settlement in the present case was cancelled or not; for as the trustee, Hamblin, has made no conveyance to divest himself of the estate given by the settlement, it remains in him subject to the trusts to be by him executed.
And in the event of failure or refusal by him, it devolves upon the court to execute it. I feel myself, however, from the facts and circumstances of the present case, compelled to say, that although there is a cancellation in part in the marriage settlement, there is no cancellation in law by the acts done by the parties; holding it to be well established, that a cancellation in form may be inoperative if done either through a mistake or fraud. I shall, however, in the first place, (although I may advert to the inoperativeness of the cancellation afterwards,) proceed to prove by some authorities, old as well as late, that the cancelling of such deed afterwards, will not divest any estate out of the person, in whom it was vested by that deed. Thus in Hudson’s case, Prac. in Chan. 235: 4 Cruise’s Dig. 497, sec. 16: 2 Vern. 476: a father having quarrelled with his eldest son, made a settlement of one hundred pounds a year, in augmentation of his wife’s jointure. Afterwards being reconciled to his son, he cancelled the deed, and so cancelled, it was found after his death by the wife. On a trial at law, the deed being proved to have been executed, was adjudged good, though cancelled; and she recovered upon it. This case proves the principle that where an estate has passed out of the grantor by his deed, or in other words, vested in the grantee, the cancellation of the deed after this, does not divest the estate thus vested, out of the grantee, and reinvest it in the grantor. It further proves, that the estate purported to be passed by the deed, passes upon the execution of the deed, and is vested forthwith in the grantee.
*415 This case of Hudson is parallel to the present. Mrs. Stokes, afterwards Mrs. Elam, is the grantor, and William Brown Hamblin grantee. Samuel Elam is a party to the deed, but as being the intended husband, the execution by him operates to show his knowledge, and his assent to the transaction; by which knowledge and assent, his common law marital rights, are commuted for the rights and privileges created and conferred on him by the powers and provisions of the settlement. As soon therefore as the deed of settlement was executed, the land negroes, &c. passed out of the hands of Mrs. Stokes the grantor, and became vested in William B. Hamblin, the grantee, and the cancellation afterwards of the deed by him, did not divest him of the estates or interest previously vested in him, and which still remain so, as far as respects the operativeness of the cancellation.
The same principle is expressly recognised in the case of Leech vs. Leech, 2 Ch. R. 4: C. D. 497, sec. 15. Where an estate has actually passed by deed, the cancel-ling of such deed afterwards, will not divest any estate out of the persons in whom they were vested by this deed. The case of Barlow and wife vs. Hencape, must, from the note of it in 2 Yern. 476, have proceeded upon the same principle. There are other old cases on the same point, and to the like effect, which I shall not further notice, than by referring to them. Latch. Rep. 226: Palm. Rep. 403: 2 Lev. Rep. 113: also, 1 Rep. in Ch. 100: Gilbert’s Rep. 236: Harg and Butler’s notes to 1st Inst. 225-6, note 36, where the learned annotator says, “ It is to be observed, that the cancelling of the deed does not divest the estate from the persons in whom it is vested by the deed. The case of Bolton vs. the Bishop of Carlisle, the Earl of Lonsdale, and Smith Clerk, is a modern case of the highest authority. 2 H. Bl. 259. Two questions were made in the cause. The first on pleading, which is not necessary to be stated. The second, whether a deed had lost its effect by the *416 seal being taken off, raising the question whether the right once vested in the plaintiff, was div'ested by the release being so cancelled; (the case stated the seal was taken off and destroyed or lost.) Lord Chief Justice Eyre: “ I have no doubt on either point; as to the second, I hold clearly, that the cancelling a deed will not divest the property which has once vested by transmutation of possession; and I would go farther and say, that the law is the same with respect to things which lie in grant. In pleading a grant, the allegation is, that the párty at such a time did grant; but if by accident, the deed be lost, there are authorities enough to show that other proof may be admitted. The question in this case is, whether the party did grant? To prove this, the best evidence must, be produced, which is the deed; but, if that be destroyed, other evidence may be received to show that the thing was granted. God forbid, that a man should lose his estate by losing his title deeds! When I sat in the Exchequer, questions arose on real compositions, in which it was contended, that according to the old opinions, the original deed must be shown; but, though the old books say that a real composition must be by deed, I always held that the production of the deed was unnecessary, and that the party could show that it commenced originally by deed, if the deed were lost.” Gould, J. “ I am of the same opinion with my Lord-Chief Justice; a man’s title to his estate is not destroyed by the destruction of his deeds. The case where the seal was eaten off by rats, must be in the recollection of every one. It was properly said by my brother Lawrence, that the defendants should have pleaded that the party did not release, upon which the issue might have been taken, and then if the deed had been cancelled by the consent of both parties, that might perhaps have been given in evidence, though I much doubt whether even that would have helped him.” Heath, J. as to the second point: “ As this is a conveyance deriving its effect from *417 the statute of uses, all that is averred about the deed be- , , . , , mg destroyed is mere surplusage; but, 11 it were necessary, surely no one will say, that if deeds should happen to be stolen, therefore that the owner should lose his estate.” Rooke, J. agreed “that a right once vested, is not divested by merely cancelling the deed.” I have been more particular in stating the substance of this decision, as it contains a summary of the law as now settled on this question at the present day, not only in deeds for land, but deeds generally.
In support of this last position, the authorities both old and recent, English and American writers, and adjudged cases, concur. Thus in Gruise’s Dig. title 32, Deed, ch* 1, sec. 29, and authorities there cited, it is laid down, “all deeds, whether deriving their effect from the common law, or the statute of uses, do immediately upon their execution by the grantors, divést the estate out of them, and put it in the party to whom the conveyance is made, though in his absence and without his notice, till some disagreement to such estate appears.” The case of Clavering vs. Clavering, (2 Ver. 473,) sustains this principle: The father settled the manor of Lansdown on his grandson, Sir James, in 1624, a voluntary conveyance; afterwards, in 1690, with regard to this settlement of 1624, he conveyed the same manor of Lansdown to his son Henry. The father never delivered or published the settlement of 1624, but it wias found after his death amongst his papers. The deed of 1690 being after mentioned by the father as the settlement of Lansdown, and so endorsed with his own hand, and the tenants told that Henry was to be their landlord after his death, it was adjudged in favor of the first deed. The Lórd Keeper observed, that if a prior deed without more, might be discharged by a subsequent deed, there would never be occasion for powers of revocation, and that would have been an idle and unnecessary provision in deeds, and would not have been so long used and practised by learned men; and (says he) although the *418 settlement of 1624, was always in the custody and power of the father, yet that did not give him a power to resume the estate.” This decree being appealed from,, was confirmed in the high court of Parliament, 16th January,, 1705. 1 Br. Pro. C. 122. These authorities establish the position, that the estate passed from Mrs. Elam to William B. Hamblin, upon execution of the deed of marriage settlement, not in its essential only, but even in all its formalities; for the defence set up, shows the possession was held by the grantee at a period subsequent to the' delivery.
But it is further argued by the counsel for the plaintiffs, the Messrs. Morgans, that if the exceptions already noticed of the estate’s not vesting in the grantee, Hambliny upon delivery; or second, that its cancellation, under the circumstances, defeated its validity, by rendering it inoperative, should be against them, neither of them rendering the deed void; yet, they insist it is void for want of registration, under the Virginia act of 1790, ch. 90, sec. 4, and the act of Tennessee of 1805, ch. 16, sec. 2, and the Virginia act of 1792, ch. 50, sec. 4. The first of these says, “That after the passing hereof, all deeds and mesne conveyances, for the absolute transfer of any estate in lands, tenements and hereditaments, or for the settlement of lands, tenements, &c. or the settlement of slaves or other personal property, in consideration of marriage, and all mortgages and deeds of trust, whatsoever, which shall be hereafter made and executed, shall be void as to creditors and subsequent purchasers, unless the execution of the same shall be acknowledged by the bargainor or grantor, or proved by two creditable witnesses at least, and registered in the county where the land lies, or in case of slaves or personal property, where the grantor, resides, within nine months from the time of executing such deed, mesne conveyance, mortgage or deed of trust.” It is to be observed, that the act does not say that the deeds of conveyance, marriage settlements and *419 deeds of trust, shall be void to all intents and purposes, ¡andan all cases, unless proved and registered m the coun<y where the land lies, within nine months, as in the case of personal property, where the grantor and bargainor reside, but they shall be only void against creditors and subsequent purchasers, leaving them good as to other purposes, and valid against the grantors, the bargainors and their heirs. And this has been the settled and uniform construction put upon registration acts. ££An unregistered deed,” says Ch. J. Kent, in delivering the opinion of the court in the case of Jackson vs. Burgott, ££is in no case void. It is always good as against the grantor and his heirs.” Fide 10 John. K. 461. The intention of the registry acts, is to prevent mischief that might ensue from parties holding up their deeds, without being clothed with the possession, thereby confining the knowledge of the transaction to themselves, to the exclusion of all others, exposing them by these means to imposition .and loss, the certain fete of the second purchaser; and to remedy these mischiefs and prevent them in future, was the object of registration acts. And it is further to be observed, this policy was not confined to marriage settlements alone and deeds of trust, but was intended to aid and embrace all conveyances for the transfer of property. Thus, when the statute of uses 27, H. VIII, ch. 10, was made to avoid the subtleties and clandestine uses at common law. 6 Com. Dig. uses, B. 1. An use by the common law, was a trust reposed in him who had the estate in the land, that the cestui que trust might take the profits. Ibid, Co. Lit. 272, b. This use was descendable and assignable by secret deeds between the parties, not liable to any of the feudal burdens, and not extendable by writ of elegit, or other legal process, for the debt of cestui que trust; which inconveniencies and mischiefs, caused said statute of H. VIII, ch. 10, to be made, which conveys the possession to the use, and transfers the use into possession, thereby making cestui que trust complete owner of the lands, as well *420 at law as in equity. 2 Bl. Cora. 333. It was foreseen that this statute would give rise to new and secret species of conveyance that would want all those benefits of notoriety which the old common law assurances were calculated to give. To prevent therefore clandestine conveyances of freeholds, the same sessiomof Parliament passed a statute, (27 Henry VIII, ch. 16,) that all bargains and sales should be enrolled in six months. 2 Bl. Com. 332.
The words of the statute are C£no manors, lands, tenements, &c. shall pass, alter, or change from one to another, whereby any estate of inheritance or freehold, shall be made . or take effect in any person, or any use thereof be made by writing indented, sealed, unless enrolled in one of the King’s courts of record at Westminster, or else within the same county, &c. where the same manors, lands, &c. lie, or be, &c. and the same enrollment to be had and made within six months next after the date of the same writings indented,” &c. The expression of this statute on the subject matter of it, is as strong and comprehensive as that of our act of 1715, ch. 32, 1805, ch. 16, sec. 2, or any other of our acts for the regulating conveyances and their registration. I have noticed it here for the purpose of showing the construction which the English chancellors have given- it. In the case of Le Neve vs. Le Neve, Lord Chancellor Hardwicke says, ccwhat has been the construction of this statute ever since? that if a subsequent bargainee has notice of a prior purchase, he is equally affected with notice, as if the prior purchase had been a conveyance by feoffment and livery.” In comparing this act with the registration act of 7 Anne, ch. 20, he says the operation of both acts of Parliament and the construction of them are the same. And it would be a most mischievous thing if a person taking the advantage of the formalities appointed by the act of Parliament, under that should protect himself against a person who had a prior equity of which he had notice. 3 Atk. 652: 1 Yes. 66: Amb. 442-3. The construction upon *421 these acts, therefore, proves that the want of registration does not render the deed void, only as to subsequent purchaser without notice of the first deed. The expression in the statute 27 Hen. VIII, ch. 16, no lands shall pass nor estate, &e. of inheritance take effect in any person unless enrolled in six months, notwithstanding couched in the most general and comprehensive terms, has only the limited operation above noticed, and of course is valid to other purposes against the grantor and his heirs.— American decisions are to the same effect; thus in Jackson vs. Burgott, (10 John. Rep. 457,) Kent, Ch. J. in delivering the opinion of the court, points out the object of registration acts, their effect upon prior and subsequent deeds, from the same grantee; he says it may be assumed as a settled principle in the English law, that when a subsequent purchaser whose deed is registered, had notice at the time of his purchase of a prior unregistered deed, the prior deed shall have the preference, for the object of the registry acts, is to give notice to subsequent purchasers. And in the case stated the object of the act is answered; and the purchase under such circumstances is a fraud. It is considered as done mala fide, by assisting the original vendor to defraud the prior vendee, and the court will not suffer a statute made to prevent fraud, to be a protection to fraud; an unregistered deed is in no case void; it is always good as against the grantor and his heirs. And the question here is between a valid and a fraudulent deed. (10 John. Rep. 457;) in which case he takes a review of the decisions of Lord Hardwicke, in Le Neve vs. Le Neve, and other cases to the same effect, approving them and adopting their principles as equally available in law and equity.
This marriage settlement and deed of trust from Mrs. Elam to Wm. H. Hamblin, is not therefore void for want of registration. I have already shown it not void by the cancellation, as the estate vested by the execution of the deed did not revest upon the cancellation and redelivery *422 up of it, to the order of the grantor. On this last point, as an additional authority, may be cited the case of Jackson vs. Chase, 2 John. Rep. 84.
If this deed of trust from Mrs. Elam to William B. Hamblin, is not rendered invalid or void, because of the cancellation in form, the estate thereby vested in the trustee, and the want of registration not rendering it void against the grantor, how is it to be considered by a court of equity upon a bill by a party praying relief? I answer it is to be considered in the same view, as if the attempt to cancel and destroy it, and the acts done in pursuance thereof, had never taken place, but the deed as still remaining in the possession of the trustee, Hamblin, and in statu quo, pursuant to the confidence reposed in him, and the trust undertaken by him. And further, it is to be considereS that this trust has been duly executed as far as the execution and delivery of the deed warranted the execution of the trust, to wit, registration of the deed, before the reception by him of further powers from the grantee by virtue of and under the deed. The power of registering it was transferred, and the duty of doing so was imposed upon him by becoming the grantee of the legal estate upon delivery of the deed and his acceptance of the same; for the power and duty became attached to the right of custody and possession. See the case of Raynell vs. Long and others, Carthew, 315.
To this extent, a court of equity will give relief, first, as against the trustee, Hamblin. It was his duty to have recorded the deed, a public statute of Virginia required it to be recorded within three months from its date; this he was bound to know and to act accordingly. The terms of the trust deed did not require this act to be done by him in so many words, but he had the means of doing it, by having the actual possession and custody of the deed, to which the law entitled him; (see the above case in Carthew’s Rep.) and the purpose of the deed, the giving of notice to all creditors and subsequent purchasers, re *423 quired its being recorded. Suppose that no act on the part of Hamblin had intervened to intercept the recording of the deed, than his mere omission in doing it, such omission would be a breach of trust, and he would be liable for the consequences. Thus, in the case of Lord Montfort vs. Lord Cadogan, (17 Ves. Jr. 425,) the Master of the Nolls, sir William Grant, says, under the marriage settlement of Lord Montfort, it was the duty of the trustee to keep these leases renewed. They are not in so many words directed to renew, but the means being given and the purpose expressed, there is no doubt, they wore to apply those means to that purpose. One easily gives credit to persons of the description of those trustees for acting only from humane and proper motives] they could act from no other; but that conviction, however it might operate as an inducement to the plaintiff to forego his strict right, cannot authorize the court to refuse to listen to his claim of indemnity on account of a breach of trust. And in the case of Caffrey vs. Darby, (6 Ves. 490,) the trustees were charged with a loss occasioned by their negligence, though without any corrupt motive. But let us see what were the other duties of the trustee expressly undertaken by him in so many words, by the solemn contract of a deed. They were to have and to hold the said estate unto the said William B. Hamblin, his heirs, executors, administrators and assigns: But upon trust and upon condition, nevertheless, for the uses and purposes hereafter mentioned, and none other. That is to say, “to suffer and to permit the said Elizabeth to hold the same, as her absolute estate, until the solemnization of the said intended marriage, and from and after the solemnization thereof, for their support and maintenance during their joint lives, using the said stocks and their increase, as may be proper and usual with persons owning such property, and so as to keep up a sufficiency for the ordinary purposes of such plantations; and? after the death of the said Elam, if he should die first.. *424 then to the sole use of said Elizabeth, as her ábsolute estate. And after the death of said Elizabeth, if she shall fii'st die, to such persons as she, by writing in the nature of a last will, executed before two witnesses, shall appoint to receive the same, and in default of said appointment, then to the next of kin, or right heirs of the said Elizabeth; provided, nevertheless, that it shall be lawful for the said Hamblin, upon the request of the said Elizabeth, in writing, to make sale of any part of said estate, and to invest the proceeds in any other property which may be expedient and proper .for the parties, or for the more comfortable support of the said Samuel and Elizabeth, during their joint lives.” These were the duties of this trustee, reposed in him by the parties, and undertaken by him to be executed under the solemnities of a deed. . His answer shows the execution. He there says, “that a short time before the marriage took place between Samuel Elam and Elizabeth, his wife, he was solicited to become a trustee, in a marriage contract, or deed, which the said Elam and wife had agreed to have executed before the solemnization of the marriage. That this respondent being the intimate acquaintance of the said Elizabeth, felt every disposition to serve her as far as he had it in his power to do so, and consented to become trustee as required by the parties; that in a short time the deed was regularly prepared under the direction of counsel, and executed a short time before the marriage, with the name of this respondent thereto attached as trustee; which deed was then delivered to him, and retained by him for some time thereafter, and until he received a letter, now in his possession, from the said Elizabeth Elam, requesting him either to send the deed by Mr. Elam, her husband, or burn it; concluding her letter with these words: “I am willing to blend our fates completely,” attaching the initials of E. E. thereto. This direction was given to this respondent before the deed was recorded, which indeed never has been done. *425 As this respondent had consented to become the trustee, as the friend of the parties, he felt no hesitation in complying with her request to cancel it, and cut his name from the paper, believing the parties had a complete and entire control over it, as long as it remained from the record, and that they were the best and entire judges of their own interest.” This answer discloses the facts, upon which equity raises his liabilities. He admits he consented to become a trustee, and that in a short time after, the deed prepared under the direction of counsel was executed, with his name attached thereto, as trustee; it was then delivered to him, and retained by him for some time thereafter. What is his liability upon these facts? In Jeremy’s Ch. Jurisdiction, page 38, it is laid down, “and here it may be observed, that if the property should have been vested, and the trust reposed in him by a deed to which he was made a party, and which as such, he executed, he would thereby have accepted the trust and bound himself to its performance.”
If he has not performed the trust, what is the consequence, what is his liability for the omission? The consequence is, that equity considers and holds the omission a breach of trust, (see the case of Lord Montfort vs. Lord Cadogan, 17 Ves. 482-9,) and makes the trustee liable for the consequences of a breach of trust. This is the settled doctrine of equity, and so laid down by Lord Redesdale, in Adair vs. Shaw, 1 Sch. and Lefr. 272. He says, “it has been the constant habit of courts of equity to charge persons in the character of trustees, with the consequence of a breach of trust, and to charge their representatives also, whether they derive benefit from the breach of trust or not.” The Master of the Rolls, Sir Willaim Grant, in the case of Montfort vs. Cadogan, recognizes and adopts this principle, as laid down by Lord Redesdale. Hamblin may therefore be rightfully visited with all the consequences, all the losses sus- *426 famed by the cestui qve trust, in the present case, whatever they may be.
But further: there are other breaches of trust in the present case, which although they may not incur a greater responsibility than non-performance, by omission or negligence, yet from the flragrancy of their nature, and unquestionably apparent evil result, and mischievous tendency, forbid even a supposition that they could have proceeded from any proper motive- whatever-. Such in the present case is the mutilation and cancellation of the trust deed. This partial cancellation in the'present case has taken place; its effect in equity is next to be seen-. Lord Hardwicke, Chancellor, in the-case of Sattern vs. Mullruish, (Amb. 249,) says, “ All cases for relief against spoliation, come in a favourable light; but, notwithstanding this rule, that things are to be taken in odium spolia-toris, yet it ought to have no other consequence than this, that when the contents of the deed destroyed are proved, the party shall have the same benefit as' he- would, If the deed itself was produced.”' u This,” says the Chancellor, “ I lay down as a principle.” In Hunt vs. Matthews, (1 Vern. 408,) a widow, before she married the defendant, assigned over the greater part of her estate, to the value of eight hundred pounds) to trustees, for her children by the first husband. The defendant, after his marriage, having got the deed into his possession, suppressed it. The court decreed him to pay the eight hundred pounds. So in Eyton vs. Eyton (2 Vern. 380,) where a defendant having suppressed a marriage settlement, by which a remainder in trust was limited to the plaintiff’s father, &c., upon proof that the settlement came to defendant’s hand, and that he had confessed it in an answer to a former bill, though he now denied it, the Master of the Rolls decided, the plaintiff should hold and enjoy the estate; and this decree was confirmed upon appeal to'the Lord Keeper. The case of Seagrave vs. Seagrave, (13 Ves. 439,) though differing in some re *427 spects from the present, yet is a stronger case upon the principles in favor of relief in cases of spoliation or destruction of the deed. The facts in that case were, a husband and wife disagreed, and upon their agreement to live separate, the husband gave a bond to her trustee for the payment of a weekly sum, for her separate maintenance. The answer of the husband and trustee admitted that tbe bond was delivered to Twanley, the trustee, to be kept for the benefit of the plaintiff, the feme, ■and that it was burnt by him, the trustee, with the consent of the husband; the feme having gone to live in a dwelling with another man. The defence set up was, that the effect of her conduct was to deprive her of all claim. The Master of the Rolls decreed relief, and observed in judgment, “the only question is, whether this court will not interfere, to the extent that is necessary, to put the parties in the same situation in which they would have been, if the destruction of that instrument had not taken place; for I cannot hold, as a separate maintenance is the subject, that the trustee contracts no kind of duty towards the cestui que trust, but may arbitrarily determine whether the instrument shall or shall not be enforced, or whether it shall be destroyed. The wife has precisely the same right that any other cestui que trust has in any case to call upon the trustee to act, and the same right to apply to the court for such relief as the loss or destruction of the instrument may make necessary.”
It is further argued, that the marriage settlement is void by the law of Virginia, for want of proper registration. (Act of Dec. 1792, ch. 90, sec. 4.) The lex loci contrac-tus, it is said, must govern, and this act comprehends all creditors, as well those of the grantee as the grantor. I have shown already that upon principles governing a court of equity, the thing which ought to have been done, and is not done by the party whose duty it was to have done it, shall be considered as done. I shall only cite on e case more to show that the want of registration is one of *428 those acts that a court of equity will supply the defect of upon a proper case requiring its interposition. It is the case of Anderson vs. Anderson, 2 Call. Rep. 206. Lyons, Judge, in .delivering the resolution of the court, says, “Fraud, however, is still left open for a court of equity to act upon, and if a creditor or purchaser has been guilty of a fraud, by preventing the deed from being recorded, or otherwise, equity may still relieve, as no person ought to take the advantage of his own fraud, and obtain the benefit of the statute by undue means; for the statute was intened to secure fair and'honest creditors and purchasers, and not protect the fraud and circumvention of either of them.
As to this act comprehending creditors of the grantee, when it says,'“deeds of trust, &c. shall be void as to all creditors and subsequent purchasers, unless proved and recorded,” &c. I need only observe that supposing the Messrs. Morgans are bona fide creditors of the grantee, Elam, they are not as such entitled to claim the trust property, against the provisions of the deed of trust. The case of Pierce vs. Turner, (5 Cranch’s Rep. 154,) settles and establishes the construction of that act as embracing only the creditors of and purchasers from the grantor.
From the principle established in the above case, Mrs. Elam does not require recourse to the doctrine of the case in Call’s Reports, showing, that the principles of equity apply to,'and supply the defect of registration; she does not stand in need of that protection, although well entitled to it, if she choose to stand on other ground; but meeting her adversary, the Messrs. Morgans, on legal ground, she calls upon them according to the practice of courts of equity, first to make out a sufficient case against her. Their claim is advanced under the title of creditor. Is it sustained? They have shown they are the creditors of the husband, Samuel Elam, the grantee, and were so for some time before her intermarriage with him, but they *429 have not shown that they arc creditors of herself, the grantor, and this last character they must sustain before their claim is available against her or her property.
As purchasers they are deficient, (claiming as cestui que trust under the deed to Crutcher, their trustee,) for the want of title in the grantor, Elam. I have already shown that the legal estate vested in Hamblin, the trustee, in the marriage settlement, and that he did not re-convey to Mrs. Elam, the grantor, or convey to Mr. Elam: that the affected and partial attempt of cancellation by him, being the trustee, in cutting out his name from the deed of settlement, and redelivery or surrender of it in this mutilated state, did not, neither would its total cancellation or entire destruction by him, have the effect as supposed and intended by him. The legal estate passed by the marriage settlement, still remained in him, and the assumption of the husband, Samuel Elam, in becoming a grantor, in the deed to Crutcher, did not render him less powerless as to the property stated in it, than he was before such partial cancellation and delivery to him.
The deed of mortgage to Crutcher, the plaintiff’s trustee, is not availing to them as creditors; but another consideration is charged in their bill and relied upon to support their mortgage deed; that is, that upon the faith of the mortgage deed being executed by Samuel Elam to Crutcher, for their use, they dismissed their suit upon the attachment, thereby giving up the alleged lien upon the property, and foregoing the effect of a judgment which they say would have been obtained, and the delay of further sueing; and from these facts a consequence is supposed to arise: 1st. That the husband, Samuel Elam, had the assent of the wife to the making of the deed, &c. 2d. That he had the power by her assent, to give validity to it. To this consequence a twofold objection exists: The consideration is not good, and the in *430 ference °f assent is repelled by evidence to the contrary; and if it was given, it is wholly impotent.
By the laws of this State, the process of attachment against a person indebted, is only given in those cases where such indebted person sustains the character of an absconding debtor, or non-resident debtor; (act of 1794, ch. 1, sec. 19 and 2L — 1 Scott, 462, 463,) because, as the act says, the ordinary process of the law cannot be served in these cases. Samuel Elam was neither the one nor the other of these. S. Elam was, at the time of issuing and levying this attachment, a citizen of Tennessee; he had in moving his property, arrived at Knoxville with his family, neither absent nor absconding, but present and in person for the ordinary process of law to be served upon him. S. Elam in his answer, states the facts in these words: “the property of respondent, which came by his wife, was removing from Virginia to Tennessee, and when himself and wife had arrived in Knoxville, the complainants took out an attachment and levied upon this property. This respondent was neither absconding, nor was he a non-resident: and how his property could be seized, and the truth be sworn in obtaining the attachment, he is at a loss to conjecture; even to his wife’s wearing apparel was seized, and the property detained at great expense. This respondent was greatly harassed and most illy treated.”
Mrs. Elam in her answer, says as follows: “she was informed, and believes it to be true, that an attachment was taken out by complainants against the property of her husband, S. Elam, and levied on the property of this respondent, to wit, a wagon and team, some household goods and clothing, together with a negro man since dead. But she insists that as her husband at the time of the issuance of the said attachment, had become a citizen of this State, and did not evade the process of the law, that his property would not have been subject to an attachment.”
*431 The attachment under these circumstances is far from being a good consideration, or any consideration but an act of demerit; and the proceeding in all its stages, repudiated by the law. The attachment was without authority by the act of assembly, and therefore a nullity.— Its service upon the trust property of Mrs. Hamblin was an illegal execution, and on this ground void. 6 Mod. 154. Its dismission and foregoing the taking a judgment which, when so obtained, would have been a void judgment, and a nullity, could not have helped the case. And the delay of further sueing amounts only to the negative merit of not pursuing the wrong, which cannot give a right.
In contemplation of law, the whole transaction amounts to a fraud upon the trustee, and the cestui que trust, in the marriage settlement.
In Hargrave’s Law Tracts, is stated a case, having, according to the answer some analogy to the present, Far’s case, Kel. 43: 1 Sid. 234. Far was found guilty of a burglary, though he entered under a writ of possession, on a judgment against the casual ejector, by default in an ejectment. It being proved that he had obtained it by false swearing to the having given notice to the tenant in possession, and that then he had entered and robbed the house of jewels and other valuable property. It is well observed by Lord Ch. J. Kelrnge, that Fir making use of the law to get possession, was so far frcfti*excusing him, that it heightened his offence.
There is no law, then, to support this mortgage, on the ground of consideration moving on the part of the complainants to the mortgagor, and whether it is on good consideration or not, will be examined in equity, upon this bill and cross bill. See2 Eq. Cas. Ab. 604: PL 34. The deed being executed without the privity or knowledge of complainants, does not change the aspect of the case, for by accepting it, and claiming under it afterwards, they have adopted it under all its circumstances, for better for worse. Neither is it to be forgotten that this deed was *432 after the levy of the attachment, during its penden-cy and before its dismission; the force of which, though Jess perhaps than legal duress, may have contributed at least in part to its existence; in which case equity may give relief. Thus, in 1 Eq. Ab. 170, PI. 3, it is there laid down, “if a bond be entered into by force and terror, not so as to make it duress, the court may relieve against it, at least not suffer it to be carried into execution in a court of equity.”
What is the principle of this case, and is it applicable to the case before this court? It is laid down by the vice chancellor Plumer, in the case of Wood vs. Abrey; he says, “if a man who meets his purchaser on equal terms, negligently sells his estate at an under value, he has no title to relief in equity; but a court of equity will enquire whether the parties really did meet on equal terms, and if.it is found the vendee was in distressed circumstances, and that advantage was taken of that distress, it will avoid the contract. ” “In the present case,” says the vice chancellor, “the distress of the vendors is beyond all doubt.” 3 Madd. Rep. 423. So I think it may be said here. S. Elam, the mortgagor, had a suit depending against him, a judgment threatened with confidence to be obtained, and a sale of his wife’s property under it. Can it be doubted that he was £ot urgecfiro the execution of the mortgage by the pressurerif his situation, which situation was imposed upon him by the wrongful acts of the complainants ?
The remaining ground taken in this case to sustain the complainant’s bill, and authorizé the relief and decree thereby prayed, is, that the letter of Mrs. Elam to the trustee, Hamblin, requesting the destruction or surrender of the marriage settlementl^mported a contract between her and her husband, to makl|to him a gift of all her property; that in equity she has an absolute power of dispo-osition, which may be manifested by any act that sufficiently indicates the intention, as by deed, bond, parol promise, or parol gift; and that she is not bound by the *433 prescribed form of the disposition in the deed or settlement. The question has been before the highest tribunals of two of the States of this Union, and in them has produced different results. And such is the diversity of opinion on this much litigated and controverted point, that unanimity of the members composing the tribunals, has not prevailed, but the decision in both rests upon majorities only.
In the State of New-York, Spencer, Ch. J. and Platt, J. who delivered their opinions seriatim, were in favor of -the enlarged powers of the feme covert over her separate estate; a majority of the court were of the same opinion.
In South Carolina, the majority were in favor of the restricted powers of a feme covert over her separate estate. Dessausure and Thompson, chancellor, dissenting.
The court of chancery of the State of New-York, in its opinion, coincides with the decision in South Carolina. The chancellor,. Kent, in a most able and learned review of all the cases on the subject, has examined the principle upon which the general doctrine rests; stated the application of these principles to the cases as they arose in the order of time, marking the changes introduced by the diversity of decision, comparing the principle upon which each case professed to turn, with the general principles, noting their accordance or disagreement with them, regretting the vascillating of the cases, jand the fluctuation of decision that has existed, and closing his very able, laborious and lucid ..review, with the following result, (though he observes in opposition partly to the later cases,) “that instead of holding that a wife is a feme sole, to all intents and purposes as to her separate property, she ought only to be deemed a feme sole sub modo, or to the extent of the power clearly given by the settlement; that instead of maintaining she has an absolute power of disposition, unless specially restrained by the instrument, the converse of the propo *434 sition would be more correct, that she has no power but ,. . , , . , . r what is specially given, and to be exercised m the mode prescribed, if any such there be. Her incapacity is general, and the exception is to be taken strictly, and to be shown in every case, because it is against the general policy and immemorial doctrine of the law.” See 3 John. Ch. Cas. 113; and see further in page 114, where he says, the doctrine runs through all the cases, that the intention of the settlement is to govern, and that it must be collected from the terms of the instrument. Thus we see the opinion of the most distinguished, able and learned chancellors are in direct opposition to each other, as to the power a feme covert has over her separate estate. I must confess, that after the best examination that my very slender abilities permit, if it were necessai^.-. by the facts of the present case, to express an opinion decisively on this much controvered subject, I at present would say, that upon the principles on which the doctrine is professed to be founded, and even upon the principle assigned in the cases favoring the enlarged powers of the feme covert, as the ground of such determination, according to my understanding of them, but above all, from the very moving cause and design of a settlement upon a feme covert, her restricted powers as laid down in the settlement itself, ought, according to the plain intent therein I and thereby expressed, to give the rule and measure its I extent, ^rejecting subtilties of wire drawn, though able, \ disquisition, and the entanglements of disputation, en-\quiry and investigation^
But it is not necessary for me, upon the facts of the present case, to express a decisive opinion upon the two conflicting and directly opposed judgments of the court of chancery of the State of New-York, and the court for the correction of errors of the same State, both being courts of the highest respectability, and filled with the ablest men, because the latter decision, with which at present I am not inclined to concur, upon the general *435 question, exempts the case before this court, expressly x ' r . ' J by the speech delivered in the judgment. Spencer, Ch. J. says, I am entirely satisfied, that the established rule in equity is, that where a /erne covert having separate property, enters into an agreement, and sufficiently indicates her intention to part with her separate estate where there is no fraud, or unfair advantage taken, a court of equity will apply it to the satisfaction of such an engagement. From this speech in judgment, it follows, that let the powers of a feme covert over her separate estate be as extensive as they may, the exercise of these powers are all palsied, and rendered nought by fraud, or an unfair advantage taken of her.
My opinion is, that fraud exists in the present case, and that an unfair advantage hath been taken of Mrs. Elam. It will he necessary to advert briefly to the marriage settlement to see her rights and her powers, and to the testimony, for the fraud and unfair advantage that has been taken of her. By the marriage settlement, executed duly in the presence of three subscribing witnesses and delivered, Mrs. Elam gives to Hamblin, the trustee, with the assent of Samuel Elam, her estate real and personal, to have and to hold to him, his heirs, executors, administrators, and assigns, in trust for the uses and purposes therein after mentioned, and none other, to wit, to her own use till the marriage, and afterwards to hold the said estate in trust, to suffer and permit her husband and herself to have and enjoy the use, advantages and profits thereof, for their support and maintenance, during their joint lives; using the said stocks and their increase as may be proper and usual with persons owning such property, and so as to keep up a sufficiency for the ordinary purposes of' such plantations. And if the husband should die first, then to her sole use as her absolute estate; and if she shall die first, to such person as she, by writing, in the -nature of a last will may appoint, executed before two witnesses, and in default of such ap~ *436 pointment, to the next of kin, or right heirs of said , , , , , , , _ Elizabeth; with a proviso, that it shall be lawful for said William B. Hamblin, upon the request of the said Elizabeth, in writing, to make sale of any part of the said estate, and to invest the proceeds in any other property which maybe expedient and proper for the parties, or for the more comfortable support of the said Samuel and Elizabeth during tlieir joint lives. Now it is apparent, that the whole object of the marriage settlement, is to preserve the substance of the capital untouched, except in one instance, and then the proceeds of the part inter-meddled with, is still to be forthcoming as capital, for it is to be invested in other property which may be expedient and proper for the parties.
The maintenance and' support of the cestui que trust, is to be derived from the rents, labour, issues and profits, as produced of and from the specific capital enumerated in the deed. The conversion of any part of which, is not to be a conversion in money, for the purposes of expenditure and consumption, but a conversion by sale and reinvestment into other specific property, whether of the same or a different kind. This is the plain meaning of the power that authorizes a sale by him, of any part of the specific capital recited in the deed, upon request of the said Elizabeth, in writing. That this is the true and correct meaning of the settlement, is unquestionable, from the final disposition of her estate after her husband’s and. her own decease. She considers it at these respective periods a continuing and subsisting estate, to be operated upon under the powers and provisions of the deed of settlement. For after the death of her husband, it is to be held for her sole use, as her absolute estate; and after her own death, if she shall first die, to such persons as she, by writing in nature of a last will, executed before two witnesses, shall appoint; and in default of such appointment, to her next of kin, or right heirs. Now this last disposition would be perfectly idle, if it was held to be *437 the intent of the settler to give any other or further power over the specific capital settled, than a sale for the purpose of a reinvestment of the proceeds of such sale in other property, which may be expedient and proper for the parties.
Such being the meaning and purpose of the marriage settlement, can it prima facie, be supposed, that an instrument made on the eve of so important a change of situation, requiring what it no doubt had, the greatest deliberation, its provisions planned and settled with caution, being prepared by counsel, and intended to secure her a support against the changes incident to the new state into which she was about to enter, and the unpropitious con-tingences which might happen during its continuance; can it be supposed, I say, that in the short space of two months after her marriage, she would cast away this shield and deprive herself of its protection, and be considered at the same time, as acting under the dictates of her judgment, not operated on by fraud, nor influenced by undue means in taking an unfair advantage of her.
The weight of these circumstances in establishing fraud, was foreseen in the argument, and by anticipation their efficacy sought to be prevented, and it was insisted that fraud must be proved, not presumed. It is admitted, this position as a doctrine is to be found in many books, and that there may be some cases susceptible of its right application; but that facts and circumstances do not show fraud, is a position not to be supported. The opposite is the constant practice in equity. See Jeremy, 396 — 7: 2 Ves. 125. The position that fraud must be proved, not presumed, (2 Ves. 155,) is at best a position of dubious accuracy; but, passing this and allowing it the greatest field of its operation, it never got farther than being a rule at law. Equity never recognized it, and the later and better opinions at law, have altogether destroyed its essence, and considered fraud as being a question of law, and not a question of fact. Thus Lord Ellenborough, *438 m delivering the very elaborate mdgment of the court of . ° f “ . ,, m , K. R. m the case of Otley vs. Manning, says, “ JJraua and covin are always questions of law. It is the judgment of law upon facts and intents.”
In Butcher vs. Butcher, (1 Ves. and B. 98, 99,) Lord Chancellor Eldon says, “The clear doctrine of Lord Hardwicke and all his predecessors was, that there were many instances of fraud that would affect instruments in equity of which the law could not take notice. Fraud ■may appear by any instrument in writing whatever, as well as by parol, if there is that in it which in construction of law amounts to a fraud in the legal sense of that term, although that term may not be used in such instrument, or in such parol proof. Fraud also may appear from the records to have taken place in the proceedings in suits, or in the transactions originating them, both in the courts of law and in equity.” There are many cases in the books showing this, both ancient and modern. I shall cite one of each and dismiss the point. In Wembish vs. Talbois, (Plowden’s Rep. 38,) an action of trespass, (4th year of Ed. 6,) the replication showed forth, that Wm. Talbois brought a formedon in descender against Elizabeth Talbois, now defendant, and recovered the first day by nient dedire, &c. and that the feme tenant was not amerced, because she came the first day by summons, &c. To this the defendant demurred; and it was held, that these circumstances of the woman defendant coming at the first day, and therefore she was not amerced, and also she was not essoigned, nor had the view, and she lost the other advantages which the law gave her, by which act there appears a voluntary assent in her, and covin apparent upon the record. In the case of Knatchbull vs. Kissane, in equity, decided in 1818, in the house of Lords, (5 Dow. 408,) Lord Eldon, in his speech in judgment, says, “ Then another question is, whether, without using the word fraud, which is often misunderstood when lawyers use it, this is a case that *439 can be sustained. It was contended by my learned friend at the bar, (Mr. Wetherell,) that there was not a sufficient charge of fraud to get rid of the lease on that ground. But I think he will agree with me, that if there is that in the bill, which in construction of law amounts to a fraud in the legal sense of that term, it is not necessary that the plaintiff should apply that term to it in the bill.”
There are other facts and circumstances in this case, showing fraud and an unfair advantage taken of Mrs. Elam. She states, in her answer to the complainant’s bill, that a few months after the marriage took effect, the said Samuel represented to her, that he owned a large real property in Nashville, which was of a very profitable and desirable description, to wit, property known by the name of the Bell tavern property; and that if he could get about ten thousand three hundred dollars of United States’ bank stock, and dispose of the same for money, that he could very nearly disencumber himself. The bank stock was secured by the deed of trust to William B. Hamblin, and the said Samuel promised to make a provision out of the Bell tavern, or other property, to the respondent, if she would agree that he might use the bank stock secured to her by the marriage contract. After much persuasion this respondent agreed that Mr. Hamblin might let her husband have the bank stock. Mr. Hamblin was applied to, but refused to transfer the stock to Major Elam,, or do any thing in the business, unless he was entirely discharged from his situation of trustee. This respondent was then much pressed and persuaded by her husband, to consent that the marriage articles should be surrendered up by said Hamblin to the said Samuel, assuring her that for any property of hers she should be-made perfectly safe by a deed of trust being made to her of the Bell tavern, and that without any difficulty the said Samuel could get through his embarrassments in Tennessee, and that her said husband believed all this *440 she had no doubt. After much persuasion, and with great reluctance, she said to William B. Hamblin that he might give up the marriage contract to Major Elam; accordingly Mr. Hamblin cut his name from the contract, leaving it entire in other respects, and gave it up to her husband, who disposed of the bank stock, &e. &c.
These facts exhibit as strong a case of fraud- as can well be imagined; I may say, as gross a case of fraud as can be found in any book, and more expecially so when we find it exerted against her by her husband, whose duty it was to succour, to protect, and to preserve her interest, instead of destroying it. A court of equity cannot see less than what every individual of observation sees and knows, that a feme covert is' more exposed to the acts, solicitations, artifices, and undue influence which a husband has over her by force of his dominion and power, in consequence of the marital relation, than one individual has over another, not standing in that or some other relation, giving also an easy ascendancy. A .false representation, even at law, when a person is about to act upon the faith of it, is a fraud. Thus Lord Kenyon, in the case of Haycraft vs. Creary, (2 East’s Rep. 103,) says, “ It is said that I imputed no fraud to this defendant at the trial. It-is true that I used no hard words, because the case did not call for them. It was enough to state that the case rested upon this, that the defendant affirmed that to be true, within his own knowledge, which he did not know to be true. This is fraudulent. It is always considered as a constructive fraud, when a party knows the truth and conceals it; and such constructive fraud always makes the party liable.” 2 Br. C. C. 389, 390. The case before this court is much stronger; for Mr. Elam not only affirmed that he owned a large real property in Nashville, which was of a very profitable and desirable description, the Bell tavern property, and that if she would consent for Hamblin to surrender the marriage settlement, that for any property of hers she *441 should be made perfectly safe, by a deed of trust to be made to her of this same Bell tavern; whereas, in truth and in fact, instead of owning a large real property, the Bell tavern, and that by a deed of trust of which property she should be made perfectly safe for any property of hers, he owned no available property in the Bell tavern, it being previously encumbered beyond its value; and as to her being made safe thereby, the affirmation was nothing ¿ess than was a mere delusive falsity. If such is the judgment of a court of law upon a misrepresentation, animadverting upon it to the extent of the injury thereby sustained, (as in the case above cited,) it cannot be supposed that a court of equity will view it.in a more favourable light, and accordingly it is laid down generally, as a broad principle, that “ fraud is regarded in courts of justice as an odious thing,” (Jeremy, 383,) embracing courts both of law and equity; and in the same book (p. 385,) it is laid down, “ that it is obviously a principle of moral conduct, that a man should be just and candid in his dealings; and therefore, where on the contrary, one seeks by misrepresentation, or even by improper concealment of facts, in the course of a transaction to mislead the judgment of another to his prejudice, this court will generally interfere;” (the author is here treating of the jurisdiction in equity.) The two means of injury here adverted to are, in more technical language, denominated the suggestio falsi, and suppressio veri. To the same is another late writer, (Newland, p. 252;) he says, “Equity sets aside a contract upon the ground of fraud, against which it is the province of that court to relieve in all its different species. Fraud, as the comprehensive mind of Lord Hardwicke has informed us, may be divided into four distinct species: first, actual fraud, arising from facts and circumstances of imposture, &c. This comprises most instances of fraud, which arise from a suggestion of falsehood, or from a suppression of the truth.” These principles of equity embrace *442 precisely the present case; the existence of either of them constitutes a fraud against which equity will give relief. Both however,exist in the present case. Samuel Elam represented that he had a large property in Nashville, and that by a deed of trust he could secure her, Mrs. Elam, for any property of hers. Here was the sug-gestio falsi, or suggestion of falsehood; and the concealing from her that this property was encumbered beyond its value, and not available to the amount of one cent, was the suppressio veri, or suppression of the truth.
These principles are not the deduction alone from the spirit of modern cases, springing from the improved state of society, and the advancement of the moral principle, as its necessary and concomitant attendant, but they are ancient heads of equity, found in the earliest equity reporters, and cherished by succeeding Chancellors downwards to the present time. Thus in the case of Jarvis et uxor vs. Duke, (1 Vern. 19, anno 1681,) it was said by the Lord Chancellor, “that it is the constant rule, where there is either suppressio veri or suggestio falsi, that the release shall be avoided. So in the case of Broderick vs. Broderick, (1 P. Wms. 240, anno 1713,) Lord Chancellor Harcourt says, ‘‘Either suppressio veri or suggestio falsi is a good reason to set aside any release or conveyance. Now to recite in a deed that the will was duly executed, when it was not, is suggestio falsi, and to conceal from the heir that the will was not duly executed, is suppressio veri, so that both circumstances concur.” The same doctrine was held by Lord Chancellor Macclesfield in the case of Cann vs. Cann, (anno 1721, 1 P Wms. 727.) So in Clermont vs. Tusburgh, (anno 1819, 1 Jac. and Walker, 120,) a case of misrepresentation, the Master of the Rolls, Sir Thomas Plummer, says, “If it be so obtained, to wit, by misrepresentation, the contract is void, both at law and in equity: where an agreement has been obtained by fraud, is the effect, to alter it partially, to cut it down or modify it only? No: it vitiates it in *443 toto, and the party who has been drawn in is totally ab- ¶ 3 r i i* • i} solved irom obligation.
So in Neville vs. Wilkinson, (1 Br. C. C. 546, anno 1782,) Chancellor Thurlow says, “If any man, upon a treaty for any contract, will make a false representation, by means of which he puts the person bargaining under a mistake upon the terms of bargain, it is a fraud; it misleads the parties contracting on the subject of the contract. ’'
From these authorities it follows, that if there had been in the present case, a conveyance to the husband of the property of Mrs. Elam, executed by the trustee Ham-blin, and purporting as authority for so doing, a request of Mrs. Elam in writing, as stated in the marriage settlement; and supposing the power in the marriage settlement had, instead of a mere power to alter or change the kind, or nature of the principal, into other property as principal, been a full power to make over and transfer the property to her husband, such transfer must have been deemed void and of no avail, from the misrepresentation, deception and fraud practised in obtaining it.
I am therefore of opinion, that the decree of the Chancellor must be affirmed, with the exception of those parts that embraced the land lying in the State of Virginia, which being beyond the limits of this State, is not within the jurisdiction of this court to be acted upon by its decree, immediately affecting it, but can only be reached immediately by and through those defendants that are before this court. See Jeremy 556-7, and notes (r,) (s,) in which case, the court has full power to act upon them personally, with respect to the subject of the suit, as the ends of justice may require, and with this view, to order them to take or omit to take, any steps either in pais, or in a court of justice, in this State, or in any other State. See 5 Mad. Rep. 307: 1 Ver. 75, 135, 419: 3 Ves. 182: 3 Atkyns, 529. The decrees, therefore, of the Chancellor will be so far corrected, and so reformed, will be the decrees of this court.
*444 Green, J.
In- this cause three principal grounds are assumed in opposition to the claim- of Mrs. Elam to the property in controversy.
1. It is argued that the marriage'settlement is cancel-led by the act of the trustee-, Hamblin, cutting out his name as signed thereto in the execution of the deed, and that the property conveyed thereby revested in Mrs. Elam-, and consequently simultaneously in her husband-
It is true that Hamblin, the trustee, did cut off from the deed his own signature and seal, and then delivered it to Mr. Elam. But this mutilation or cancelment of the deed could not deprive Mrs. Elam of the benefits intended to be secured by it. The conveyance had been made by her to Hamblin, before the marriage, and had vested in him as her trustee, the legal estate in the property conveyed, and in her a right to its enjoyment and use. The estate actually passed by the deed, and was vested by it in the parties; the cancelling the deed afterwards could not and did not divest it. 4 Cruise’s Dig. 497, sec. 15: 1 Inst. 225, note 136: 2 H. Bl. 259.
2. But it is further argued, that Mrs: Elam had all the rights of a feme sole over her separate estate, secured by the deed; that she had full power to dispose of it as she pleased, and consequently to give it to her husband; and that the cancelling the* deed with her consent was sufficient to vest in her husband the personal property secured by it.
This leads us to the consideration of a question of great importance to society, and one upon which the ablest chancellors have entertained different- opinions. The weight of authority from the English Books, is in favor of the exercise by a married woman having a separate estate of all the powers of a feme sole in the management and disposition of that estate. In the American courts, there has been great diversity of opinion. I shall not attempt a review of the cases where the point has been adjudicated, but shall content myself with referring to the *445 case of Jacques vs. M. E. Church, (3 John. Ch. Rep. 113, 114,) where Chancellor Kent has collected and reviewed, in an able opinion, all the cases on this subject. I regard this question as being unsettled in this country, and that this court is under no obligation, from a concurrent course of legal adjudication, to sacrifice principle to precedent. All the cases agree, that it is competent to "the parties to tie up an estate for the benefit of a married woman, placing it beyond the control of the husband, and devotipg the proceeds to the separate use of the wife.— Such marriage settlements have been uniformly supported by the courts. It seems to-me, that if supported at all, they ought to be supported according to their plain sense, and the manifest intention of the grantor. It is af mockery to talk about supporting a conveyance, and atl the same time give it such a construction as will allow al disposition to be made of the estate, which it was the man-* ifest intention of the grantor to guard against.
Upon principle, therefore, the courts ought to give such effect to a deed of marriage settlement, as the person making the grant intended it should have; which intention is to be collected from the whole scope of the instrument. But it is said by some of those who contend for a latitudinous construction of these conveyances, (a) that it is for the interest of society that the common law rule that the husband becomes owner of all the wife’s personal estate, should prevail; and that therefore, it is best that the rule of construction should be adopted, which will enable the husband by the consent of the wife, to possess himself of her estate; and this, too, contrary to the manifest intention of the friend who may have settled it on her. This argument is as defective in morals, as it is in sound legal principle. It defeats the prudent foresight of the settler, by enabling the husband and wife to *446 make a disposition of the estate which the deed was especially intended to prevent; and at the same time it holds out an inducement of the strongest character for the husband to use undue means to obtain for himself his wife’s estate.
Those who have the least acquaintance with the relations which exist between husband and wife, cannot fail •to know, that he will be able, almost universally, to obtain from her every thing she has power to bestow. Undue means will be resorted to, and improper influences will be exerted upon the wife, and this in a manner which can scarcely ever be detected. The influences which are used improperly, to control the conduct of a wife in relation to her property, are most apt to come in the guise of extreme fondness. The exalted and ;generous sentiment of love, is counterfeited by the husband, under the influence of his cupidity for his wife’s estate. Surely a just regard to the morals of society, and an honest fulfilment of the intentions of the grantor, alike demand that the powers of a married woman over her separate estate, shall not extend beyond the plain meaning of the deed creating the estate. For the contrary doctrine does but invite men to commit frauds on their wives ;£an invitation to which husbands generally would not be insensibly It is but necessary to put' on the appearance of extreme fondness for the wife, with professions of great concern for her interests, a few truths suppressed, and falsehoods suggested in relation to his own estate and pecuniary condition, and she is ready, in all the ardor oí confiding love, to throw herself and all she has into the arms of her husband, or in the language of Mrs. Elam, “to blend her fate with-his.”
As by the common law rule, the legal existence of the wife is suspended during the coverture, and she is rendered incapable of making any contract, it would seem to follow that when separate rights and distinct powers are conferred on her by a deed of marriage settlement, that *447 such deed should be so construed as to save her none of , , - ,71, 7 the powers oí a jeme sole, other than tiiose expres_siy conferred by it.
Upon the whole, I conclude that the farthest thef court can go upon principle, is to ascertain by a fair construction of the deed, what was the intention of the grantor, and to cause that intention to be carried into effect. 2 Kent’s Com. 139. Upon this principle I decided the case of Brandy vs. Brantly, when I sat on the chancery bench, and the subsequent consideration I have given the subject, has but tended to confirm me in the correctness of the opinion I then entertained.
This leads us to examine the terms of this deed, and to ascertain the intention with which it was executed.
After conveying the estate to Hamblin, the deed stipulates that he is to hold it in trust, “for the uses and purposes hereinafter mentioned, and none other; that is to say, to suffer and permit the said Elizabeth to hold the same as her absolute estate, until the solemnization of the said intended marriage; and from and after the solemnization thereof, then to hold said estate in trust; to suffer and permit the said Samuel and Elizabeth to have and enjoy the use, advantage and profits thereof, for their support and maintenance during their joint livrc;, using the said stocks and their increase, as may be proper and usual with persons owning such property, and so as to keep up a sufficiency for the ordinary purposes of such plantations.” These stipulations, limiting as they do the disposition of the property for their “maintenance and support during their joint lives,” exclude the disposition of it for any other purpose. But even for the attainment of this object, the principal fund was not to be lessened or impaired, for the deed stipulates that this maintenance and support was to be derived from the use and profits of the estate. If any thing were wanting to confirm this conclusion, the subsequent provision of the deed would placeitbeyond doubt. It is stipulated, that, “after the *448 ^eat^ ^ie sa^ Elam, should he die first, then the estate should go to the sole use of the said Elizabeth, as her absolute estate; and after the death of the said Elizabeth, should she first die, to such persons as she by writing in the nature of a last will, executed before two witnesses, shall appoint to receive the same; and in default of such appointment, then to the next of kin or right heirs of her, the said Elizabeth.”
These clauses plainly show, that it was contemplated that the estate was not to be disposed of, so as to exhaust or lessen the principal fund; but that it should subsist during the coverture, and afterwards be disposed of in the manner specified in the deed. Why was a particular mode of disposition, “by writing in the nature of a last will,” designated by the deed, if it was intended that Mrs. Elam should have the power to dispose of it in any other manner she might select? and why were they restricted to the use of the profits of the estate, for their support and maintenance, if it were intended that the whole fund might be appropriated for any other purpose? It seems irresistible to me, that it was intended to restrict the use of the estate to the taking the profits, and the disposition of it to an appointment “by writing in the nature of a last will.” This being the intention of Mrs. Elam in making the deed, I am of opinion that she had no power after she was married to dispose of her estate for other purposes or in a different mode than the stipulations of the deed expressly warrant.
The stipulation in the proviso to the deed, that the trustee on the request of Mrs. Elam in writing, should be “authorized to make sale of any part of the estate, and invest the proceeds in other property,” &c. does not affect the construction I have given to the former part of the deed. This provision only contemplated a change of the estate in form, without affecting it in substance, without reducing it in amount. It follows from this view of the question, that any gift of Mrs. Elam to her hus *449 band, or directions to Hamblin, the trustee, did not change, or m the least degree affect her rights as hxed and settled by the deed; because she had no power to make such gift or to authorize Hamblin to cancel the deed.
S. But it is insisted, that the deed in this case not having been recorded as required by the act of Virginia, 1792, ch. 90, sec. 4, (Rev. Laws, 1814, p. 219,) it is void as to the creditors of Elam.
This question came before the supreme court of the United States in the case of Pierce vs. Turner, (5 Cranch,) upon the construction of this statute of conveyances of Virginia, and it was decided, that an ante nuptial marriage settlement of the wife’s property, if not duly recorded, is void against the creditors of the wife only, but not against the creditors of the husband; and that the act applies only to the creditors of the grantor. When this case was argued at the last term of this court, I was not willing to yield the opinion I entertained of the true construction of this statute, to the authority of the case of Pierce vs. Turner. The statute says, that “all deeds of settlement upon marriage, shall be void as to all creditors and subsequent purchasers, unless they be recorded,” &e. The letter of this statute embraces the creditors of the husband; protection to them, against such secret unregistered settlements is within the policy of the law; I had therefore thought, that the intent and effect of the statute was to protect the creditors of the husband as well as the wife.
Since the last term of the court, I have examined the case of Laud vs. Jeffries, (5 Rand. Rep. 211,) where I find the court of appeals of Virginia approve the decision in the case of Pierce vs. Turner, and (one judge only dissenting) give the same construction to the statute under consideration. The authority of these two cases is too imposing for me to resist. I shall therefore concur in the construction they have given to this statute; not *450 because I am convinced of its correctness, but because I . , , , ,. . , , reel that I ought to distrust my own judgment, and yield to the concurrent high authorities of the supreme court of the United States and of the Slate whose statute we are considering.
The decrees in these several cases will therefore be affirmed, with the modification suggested in judge Whyte’s opinion,
Catron, Ch. J.
Although I have taken no part in the decision in this cause, yet my brother judges desire my concurrence on one point, to wit, as to the extent of the jpower of a feme covert over property settled to her sep-larate use, and for her separate maintenance.
What the English doctrine is upon the subject, it is difficult to ascertain. The decisions are so confused and repugnant, that Lord Eldon’s complaint in Sperling vs. Rochfort, (8 Ves.) is most true. He says, “upon all those cases together it is utterly impossible to know the result.” There are two classes of cases which lay down different rules. The one, that a married woman with separate property has no power over it, but that which is conferred on her by the settlement. Lord Strange vs. Smith, Amb: Socket vs. Wray, 4 Bro: Whistler vs. Newman, 4 Ves: Mores vs. Huish, 5 Ves: Harvey vs. Blakeman, 9 Ves: Francis vs. Wizzle, 1 Madd. Rep. 6. The other class lays down the rule, that a feme covert with separate property, is to all intents a feme sole, except so far as she is restrained by the instrument under which she claims. Pybus vs. Smith, 1 Ves: Fettiplace vs. Gorges, 3 Bro: With vs. Dawkins, 12 Ves: Brown vs. Lake, 14 Ves: Essex vs. Atkins, 14 Ves. the case cited from New York by Judge Green, &c. Nothing has been adjudged in this State upon the subject, save in the chancery court in Brantley vs. Brantley. That cause was argued in the Supreme Court with superior ability, and advised upon. I examined it well during the year it was before *451 the court, having the aid of a written argument by Judge Clayton, which is by far the most learned examination of the subject I have met with, and from which this opinion is principally extracted. I found the reported cases of little use, and calculated rather to disturb than confirm a well settled principle of the common law, that a married woman has no property or powers. But equity permits her to be exempt from this rule, so far as she stipulates for exemption; yet, the court can give her no powers beyond those given by the settlement. She acts substantially as an attorney in fact in such case, as she well may in any other. In either she must pursue the express authority; all beyond it is void.
Judge Whyte and myself heard Brantley vs. Brantley, and concurred in the foregoing result in conformity to the Chancellor’s decree and Judge Clayton’s argument; but learning the cause was compromised, our opinion was not reduced to writing. It went off on the compromise.
Peck, J.
was of opinion that the deed of marriage settlement from Mrs. Stokes to Hamblin, ivas void as to the creditors of Samuel Elam, the husband, for want of registration, and that the decree of the Chancellor ought to be reversed.
Judgment affirmed.

 See Judge Platt’s opinion, in Jacques vs. M. E. Church, 17 Johns. Rep.