## J. FRED JOHNSON *et al. v.* J. D. FORD *et al.*

### (*Knoxville.* September Term, 1922.)

1. **WATERS AND WATER COURSES.** Option for water rights held not fraudulently procured.

    In suit for money paid in excess of option price for water rights, evidence *held* not to show that the option was procured by fraud. (*Post, p.* 77.)

2. **WATERS AND WATER COURSES.** Option for water rights held not indefinite.

    Option for water rights *held* not indefinite for uncertainty as to whether requirement of execution of a "proper deed" meant a deed with covenants, where the parties themselves construed such a requirement in a later and similar option to mean a deed with covenants. (*Post, p.* 77.)

3. **VENDOR AND PURCHASER.** "Proper deed" means deed with covenants.

    A contract requirement of a "proper deed" means a deed in fee simple with covenants. (*Post, p.* 77.)

    Case cited and approved: Carver v. Williams, 10 Ind., 267.

4. **VENDOR AND PURCHASER.** Where option was not to be effective until all optionors signed, it took effect when last signature obtained.

    Where it was not contemplated that an option was to be binding and effective until signed and delivered, and the date was left blank to be filled in when the last signature was obtained, the date of the option was the date when the last signature was obtained. (*Post, p.* 78.)

5. **DEEDS.** Specific performance. Vendor and purchaser. Specific performance of first option not granted, where optionees took second option; deed held to merge option; damages for breach of option held waived.

Johnson v. Ford.

Where optionors refused to proceed under their option, and option-
ees, paying an advanced price, procured from them a second op-
tion upon the same property, and. the execution of a deed in ful-
fillment of the second option, optionees were not entitled to speci-
fic performance of the first option with respect to certain rights
not contained in the second option and the deed as, by electing to
take under the second option, and by having the deed executed
pursuant thereto, they waived all rights under the first option, and
it became merged in the deed; nor were optionees entitled to dam-
ages for breach of the first option, as, by taking the deed under
the second option, they made performance of the first option im-
possible.   (*Post*, *p.* 78.)

6. **PAYMENT.**   Increased price exacted for option held recoverable
as paid under duress.

Where optionors fixed their own price, $10,000, for water rights, and
gave option thereon at such price, which was a full one, and op-
tionees had expended and obligated themselves in excess of $100,-
000 in a project for a manufacturing plant costing millions, to
which the water rights were necessary, relying on such option,
as well as other options .secured, and optionors refused to carry
out the option by executing deed when called upon to do so by
optionees, so that optionees faced a delay by litigation which
would necessitate abandoning the project, and optionees thereup-
on took another option from optionors on the same property at
$25,000, and had deed executed pursuant thereto, *held* that they
could recover the excess of $15,000 as having been compelled to
be paid by duress of property.   (*Post*, *p.* 79-82.

7. **VENDOR AND PURCHASER.**   Optionor's anticipatory breach is
immaterial.

Refusal of the optionor to perform, before any demand is made on
him by the optionee, is not a renunciation of the option so as to
determine the optionee's rights, where the option is based on a
valid consideration.   (*Post*, *p.* 82-96.)

Cases cited and approved: Mier v. Hadden, 148 Mich., 488; First
National Bank v. Sargent, 65 Neb., 594; Hackley v. Headley, 45
Mich., 569; Parmentier v. Pater, 13 Or., 121; Brown v. Pierce.

Johnson v. Ford.

7 Wall., 214; Baker v. Morton, 12 Wall., 157; French v. Shoe-maker, 14 Wall., 322; United States v. Huckabee, 16 Wall., 431; Joannin v. Ogilvie, 49 Minn., 564; Fargusson v. Winslow, 34 Minn., 384; Fraser v. Pendlebury, 31 L. J. C. P. N. S., 1; Pemberton v. Williams, 87 Ill., 15; Close v. Phipps, 7 Mann. & G., 586; White v. Heylman, 34 Pa., 142; State ex rel. McCardy v. Nelson, 41 Minn., 24; Guetzkow Bros. Co. v. Breese, 96 Wis., 591; Chase v. Dwinal, 7 Me., 134; Mays v. Cincinnati, 1 Ohio St., 268; Adams v. Schiffer, 11 Colo., 15; Chamberlain v. Reed, 13 Me., 357; White v. Heyl-man, 34 Pa., 142; Crawford v. Cato, 22 Ga., 594; Central Bank v. Copeland, 18 Md., 305; Scholey v. Mumford, 60 N. Y., 498; Astley v. Reynolds, 2 Strange, 915; Brumagin v. Tillinghast, 18 Cal., 265; Radich v. Hutchins, 95 U. S., 210; Cazenove v. Cutler, 4 Met., 246; Fraser v. Pendlebury, 31 L. J. C. P. N. S., 1; Bennett v. Healey, 6 Minn., 240; Freeman v. Etter, 21 Minn., 3; McMurtrie v. Keenan, 109 Mass., 185; Rowland v. Watson, 4 Cal. App., 476; Carew v. Rutherford, 106 Mass., 1; Matthews v. Williams Brewing Co., 26 Misc., 46; Kamenitsky v. Corcoran, 97 Misc., 384; Newland v. Buncombe Turnpike Co., 26 N. C., 372; Redford v. Weller, 27 S. D., 334; Rees v. Schmits, 164 Ill. App., 250; Hackley v. Head-ley, 45 Mich., 569; Burke v. Gould, 105 Cal., 277; Brown v. Worth-ington, 162 Mo. App., 508; Lonergan v. Marcus B. Buford, 148 U. S., 581.

8. PAYMENT. Return of property received not necessary to recover payment under duress of property.

It is not required that property transferred in consideration of a payment be returned in order to recover part of the payment as having been exacted by duress of property. (*Post, p.* 96, 97.)

9. ESTOPPEL. Grantor held estopped to question title.

Where optionors had their title duly investigated before conveying under their option, and only when optionees sought to recover part of the option price as paid under duress of property did they question their title by seeking to have their deed canceled as con-veying a title they could not convey, *held* that they were estopped to question their title. (*Post, p.* 97-99.)

146 Tenn.—5

Johnson v. Ford.

Cases cited and approved: Gill v. McKinney, 140 Tenn., 549; Ferguson v. Prince, 136 Tenn., 548; Mengel Box Co. v. Ferguson, 124 Tenn., 443; Ruffin v. Johnson, 52 Tenn., 608; Rogers v. Cawood, 31 Tenn., 142; Wilson v. Bass, 6 Tenn., 110; Moseley v. Stewart, 52 S. W., 671; Spurlock v. Brown, 91 Tenn., 260.

FROM SULLIVAN.

Appeal from the Chancery Court of Sullivan County.— HON. HAL H. HAYNES, Chancellor.

MORISON, KELLY & PENN and COX & TAYLOR, for appellants.

E. K. BACHMAN, MILLER & DEPEW and G. T. LEE, for appellees.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

The original bill in this cause was filed on August 21, 1920, by the Tennessee Eastman Corporation and J. Fred Johnson, in his own right and for the use and benefit of the Tennessee Eastman Corporation, against J. D. Ford, Mattie E. Ford, his wife, Mabel Todd, only child of J. D. and Mattie E. Ford, and J. C. Todd, her husband, for the purpose of recovering the sum of $15,000, with interest, which the bill alleged was paid to the defendants without consideration and under duress of property.

The controversy grew out of the following state of facts, to-wit: J. Fred Johnson, as president of the Kingsport Improvement Corporation, was interested in procuring the

location of industrial plants at Kingsport, and after several months of negotiation with the Eastman Kodak Company of Rochester, N. Y., induced it to take over an abandoned war plant at Kingsport, Tenn., and to operate therein a plant for the manufacture of wood alcohol, necessary in its business of manufacturing photographic supplies, and that to this end the Tennessee Eastman Corporation, one of the complainants, was later formed. The purchase of the war plant was consummated on May 26, 1920, by deed from the United States of America to James S. Havens, who acted as agent for the purchasers, and who, pursuant to his agency, by deed dated August 28, 1920, conveyed the said property to the said Tennessee Eastman Corporation, being a corporation which was organized under the laws of Virginia on July 20, 1920, and domesticated in Tennessee on July 29, 1920.

At the time the testimony was taken in the cause under consideration the amount which the company had invested in said alcohol plant was approximately $1,000,000.

In the summer of 1920, after the wood alcohol plant had been purchased, the same parties became very much interested in the construction of another plant at Kingsport, for the manufacture of gelatin, a product which up to that time had only been manufactured successfully in Germany, and which product is used in the manufacture of photographic goods, particularly films. This plant was to be much larger than the wood alcohol plant, and was to involve, together with a power plant, therewith, an expenditure of $3,500,000. The complainant corporation purchased more than three hundred acres of land for the gelatin plant.

Pending the consideration of the establishment of this gelatin plant, engineers and experts were sent to Kingsport for the purpose of investigating the proposition. They were favorably impressed with the natural resources in East Tennessee and with the location of the new development at Kingsport. They reported, however, that before the proposition could go through it would be absolutely necessary to procure the water from Kendrick's creek, about five miles east of Kingsport, the water from this creek being the only suitable supply found.

Thereupon the complainant J. Fred Johnson was requested by the representatives of the Tennessee Eastman Corporation to procure the necessary water rights on Kendrick's creek; and in an effort to comply with this request he called to his assistance Mr. J. D. Ford, one of the defendants, who, he then thought, was an important riparian owner on Kendrick's creek, but who, it later developed, was not the sole owner of the property on which he lived, but was interested in same along with the members of his family. The water rights of defendants were at the mouth of the creek, below all others, and were absolutely essential to the proposed development. Mr. Johnson took Mr. Ford into his confidence, explaining to him fully the plans of the Tennessee Eastman Corporation with respect to the proposed new development, and the purpose for which the water from Kendrick's creek was desired.

The said Ford accepted the confidence reposed, and agreed for consideration to assist complainants in procuring options covering the necessary water rights, and did, in pursuance of this agreement, take the lead in conducting these negotiations, and procured contracts from most of the riparian owners.

While the said Ford was engaged in this behalf, Johnson requested him to put a price upon his own rights, and, according to the testimony of Mr. Johnson and Mr. Dobyns, the substance of his reply was:

"You will not be hurt, it will not cost you over $10,000, and if we have to pay more than I think we should for the others, I may make it $7,500."

About this time, to-wit, on July 13, 1920, upon request from Mr. Johnson, Mr. Ford went to the office of complainants' attorney, Mr. Kelly, at Kingsport, and had an option prepared covering the Ford rights. This option was drawn upon information given by Mr. Ford, who stated to the said attorney that the consideration would be $10,000, and that it would be necessary for the option to be signed by himself, his wife, Mrs. Mattie E. Ford, his daughter, Mrs. Mabel Todd, and her husband, J. C. Todd. The said attorney thereupon prepared the said option, which, by its terms, was to continue in force "for the period of thirty (30) days from this date," but the date was left blank; Mr. Kelly testifying that the purpose was to have the blank filled in when the last signature of the last of the parties was affixed.

Defendant J. D. Ford signed this option on July 13, 1920, without filling in the date, and acknowledged same, and on the next day the same was executed and acknowledged by Mrs. Mattie E. Ford and daughter, Mrs. Mabel Todd, without either of them filling in the date, and at that time the consideration of $10, evidenced by check, was turned over to and received by Mrs. Ford. The signature and acknowledgment of J. C. Todd was had on July 17th. All of the acknowledgments were taken by Miss Mamie Stephenson, and on July 17th she attached her certificate,

certifying that the execution of said option had been. acknowledged before her by all parties. It should be stated that Miss Stephenson presented said option to Mr. Todd for his signature on July 16th, but he refused to sign it at that time, stating that Mrs. Ford had requested him not to do so. According to the evidence, he stated that he considered that the price was all right, but that he desired to see Mrs. Ford before signing it.

At the time Mr. Todd signed the option the day of the month was still omitted, and all of the parties interested on both sides overlooked this matter, and failed to insert the date. The date of July 17th was, after said certificate had been attached, inserted by Mr. Gilmer, stenographer for Mr. Kelly, but without authority, and said option was taken by Mr. Gilmer to Blountville, on the afternoon of the 17th for registration.

It further appears from the record that Mr. J. W. Dobyns, who had been working with Mr. Ford in procuring options for these water rights, spent the night at the Ford home on July 14th, the day that Mrs. Ford and her daughter signed said option, and that while there he told Mr. and Mrs. Ford that one R. T. Kinchelow, another riparian owner on Kendrick's creek just above them, had just signed an option for his water rights for the consideration of $24,000.

On July 15th, the morning after Mrs. Ford had been advised as to the price Kinchelow was to receive for his water rights, she sent word to her son-in-law, Mr. Todd, not to sign the option.

It further appears from the record that on July 17th, before Mr. Todd had signed the option, Mr. Ford told complainant Johnson, according to the latter's testimony, that

he did not believe his wife would execute a deed in pursuance of the option.

On July 19th, Mrs. Ford came to the office of Mr. Johnson in Kingsport, and, according to the testimony of Mr. Johnson, objected to signing the deed pursuant to the option, and stated to him that, if the rights of Kinchelow were worth $24,000, her rights were worth that much or more, and she requested Johnson to give her his personal check for more money to be used in the event the option was exercised.

On July 21st, both J. D. Ford and his wife told complainant Johnson that they would not execute a deed under the option.

By July 15, 1920, options covering all of the necessary water rights on Kendrick's creek had been procured, except that the said J. C. Todd had not signed the Ford option. On this date, Mr. Johnson advised Mr. Eastman, who was then in Kingsport, that the necessary water rights were covered by options, and on this date, July 15th, Mr. Eastman carefully reviewed the whole situation with reference to the feasibility of building a gelatin plant, personally visited the proposed water supply on Kendrick's creek, and just before leaving Kingsport on July 15th or 16th he told Mr. Johnson to go ahead with the arrangements to purchase the water supply, and that the Eastman interests would purchase the property for the site of the gelatin plant, which was subsequently consummated, of a plant site from Kingsport Farms, Incorporated, of which Mr. Johnson was president, at a cost of $55,528, being a tract of 277.64 acres.

Relying upon the fact that options had been taken covering the necessary water rights, the plans for the gelatin

plant were carried forward, and instructions were given that the necessary examinations be made of the titles, and that deeds be taken for the water rights.

On August 13th, 1920, pursuant to instructions from Mr. George Eastman, as above shown, Mr. Johnson proceeded to take deeds from the parties on Kendrick's creek. Later and on the same day, notice was given and legal tender made to J. D. Ford and Mattie E. Ford, with request that they execute a deed in compliance with their option, but both of the said Fords refused to do so, assigning as their only reason for such refusal that the option had expired and that it had not been acknowledged.

On August 14th like notice was given and tender made to Mrs. Mabel Todd and J. C. Todd, with request that they execute a deed in compliance with their option, but both of them refused to do so, stating that they would do nothing until advised by Mr. and Mrs. Ford.

The record further shows that when complainant Johnson was notified of the refusal of defendants to execute a deed under the option he was greatly disturbed. He then realized that a failure to procure their interests (all of the water rights being worthless without the Fords') would not only be fatal to the consummation of extensive plans of the Eastman Corporation in reference to its gelatin plant, but would result in a loss of all the money which had been expended in and about the proposed development, amounting to more than $100,000. Acting in this dilemma and in this stress of circumstances, and realizing that it would be utterly impossible to hold the proposed industry in abeyance until the rights of the parties could be definitely and finally determined in the courts, Mr. Johnson, on Saturday, August 14, 1920, went to the home of the de-

fendants J. D. and Mattie E. Ford, and there, for three or four hours, begged and pleaded with them in an effort to get them to comply with their contract, and not to take advantage of the exigencies of the situation, but to do that which, in equity and good conscience, they had for consideration bound themselves to do. His appeal to their sense of fairness was without avail. At the outset he was met with the statement from Mr. J. D. Ford that the price was then $35,000, and that on Monday morning, if he lived to get to Johnson City to see a lawyer, it would be $100,-000. This was denied by Mr. Ford.

Having exhausted every means at his hands to induce the Fords to carry out their said option, Mr. Johnson then took from them an option for ten days, at which the price was fixed at $25,000, and which, while it referred to the same real estate, and gave the same general character of water rights, did not embrace all of the rights included in the first option.

The record further shows that while this second option was in process of being drafted, executed, and delivered, the question came up as to the disposition of the first option, when complainant Johnson refused to surrender the same, and notified the defendants J. D. and Mattie E. Ford that whatever rights the Tennessee Eastman Corporation might have thereunder should remain unimpaired.

The record further shows that under these circumstances, and without intending to waive any of their rights, and in order to get a deed for the Ford water rights, they took a deed with covenants from the defendants under said second option, paying them $25,000, and on the same day filed the present bill to recover $15,000 of the money so paid, upon the grounds, as previously stated, that there was no

consideration to support it, and upon the further ground that it was paid under duress of property.

The issues involved are summarized in complainants' brief as follows:

"(1) Complainants contend that the option dated July 17, 1920, for $10,000, was executed, delivered, and took effect, and defendants deny this on the following grounds:

"(a) That after the option was signed by Mr. and Mrs. Ford and Mrs. Todd, and before it was signed by Mr. Todd, it was withdrawn by the defendants who had signed it;

"(b) That Mr. Todd's signature to the said option was procured by fraud, and that therefore the instrument was never completed; and

"(c) That the said option cannot be enforced by the court, because the title of defendants was not such as to enable them to make a good conveyance.

"(2) Complainants contend that the option ran thirty days from July 17, 1920, the date on which the last of the optionors executed it, and therefore was in force on August 13 and 14, 1920, when complainants undertook to procure a deed thereunder. Defendants contend that it ran from July 13, 1920, the date the first optionor signed it, and expired on August 12, 1920, before notice was given.

"(3) Complainants contend and defendants deny that on August 13 and 14, 1920, the option then being in force, complainants took the necessary steps to comply with it and convert it into a binding contract to convey, entitling them to specific performance of it.

"(4) Complainants contend that in taking the second option and deed thereunder, they did not lose but still have the right to specific performance of the first option in respect to certain rights which it covered and which are not

covered by the second option and deed thereunder.   No
right to specific performance is claimed to any of the prop-
erty or rights covered by the second option or by the deed.

"(5) Complainants further contend that, in taking the
second option and deed thereunder, and paying $25,000,
when they did so the right then accrued to them to recover
the sum of $15,000 as an excess payment, on the ground
that same was paid without any consideration, and that
there exists a complete absence and failure of considera-
tion therefor, because said sum was paid for property which
complainants were already entitled to have for the sum
of $10,000.

"Complainants also contend that they have the right to
recover said sum of $15,000 as actual damages resulting
to them from the breach on the part of the defendants of
their contract, and, further, that they have the right to
recover this $15,000 because the payment thereof to de-
fendants was enforced under circumstances that amounted
in law to duress of property.

"Defendants deny these rights, and contend that in tak-
ing the second option and deed thereunder complainants
waived and merged any rights which they then had under
the first option, and estopped themselves from claiming
any such rights.

"(6) Complainants further contend that they are en-
titled to recover said sum of $15,000 from defendant J.
D. Ford alone, because he, acting as their agent, through
which relationship he knew of their plans and necessities,
assured them that the rights involved in this cause would
be delivered to them at a price not greater than $10,000,
and this assurance was relied upon by complainants in
making plans and large expenditures, as above set out,

thereby rendering the said J. D. Ford liable in damages to complainants for not making this assurance good, but willfully refusing to do so.

"Defendants, in denying the contention of complainants in this regard, interpose a plea of the statute of frauds. However, in their sworn answer filed in this cause, it is stated: 'Previous to the date of the 13th of July, above stated, complainant Johnson had had a conversation with defendant Ford, in which the said Ford had said that they would be willing to take $10,000 for their rights, but on the occasion of the drawing up of the so-called option nothing was said about the price thereof.'

"(7) Complainants further contend that the circumstances of this case entitle them to treble damages against defendant J. D. Ford for inducing his codefendants to breach their contract with complainants, as provided in section 3193a8 of Shannon's Code, and that under this section they should recover from said Ford the sum of $45,000."

There is one other issue raised by a cross-bill filed by the defendants, wherein it was insisted that cross-complainants did not have such title to said property as they could convey, and that they were misled by counsel for the complainants into believing that they did have a good title to said property, and they asked that they be permitted to return the consideration of $25,000, with interest, and have said deed canceled.

To this cross-bill, a demurrer was interposed, to the effect that the cross-bill did not disclose such a state of facts as would justify the court in holding that said deed was procured upon the misrepresentation of the complainants, and they, having executed said deed and having re-

ceived the consideration therefor, after having taken advice, were in law estopped to question their title.

We will discuss the questions involved in the order hereinabove designated.

Was the option dated July 17, 1920, valid and effective?

The chancellor so held, and we concur in the conclusions announced by him. As to its having been withdrawn before execution by Mr. Todd, we have the testimony of Mr. Ford that he told Mr. Johnson that his wife would not execute the deed, but Mr. Johnson testified that Mr. Ford merely stated to him that he was apprehensive about his wife executing the deed. And upon this issue the burden would be upon the defendants, and they have not carried the burden.

Without detailing the evidence, we find that the defendants have not carried the burden of showing that Mr. Todd's signature was procured by fraud.

Passing, for the present, the question of the title of the defendants, which will be referred to later, we find that the said option was valid and binding upon the defendants.

Under this head the defendants also make the point that the option was invalid for uncertainty, in that it provided that "a proper deed should be executed."

In our opinion, the parties themselves construed this to mean a deed with covenants, since both options contained this same provision, and, in executing a deed under the second option, they executed a deed with covenants.

In *Carver* v. *Williams*, 10 Ind., 267, it was held that the term "good deed" in a bond calling for a good deed means a deed in *fee simple* with covenants. And in the present cause the term "a proper deed" means the same thing.

2. As to this issue we also concur with the chancellor in holding that the said option ran for thirty days from July 17, 1920, and not thirty days from July 13th, as contended by the defendants.

Treating the action of Mr. Gilmer in inserting the date after it had been acknowledged and the certificate attached as unwarranted and illegal, and treating it as though the date had been omitted, the instrument did not take effect until the 17th, for the reason that it was expressly stated by Mr. Ford that it was necessary for all of the defendants to sign it, and it was not contemplated that it was to be binding and effective until so signed and delivered, which, as previously stated, occurred on July 17, 1920. In addition, we have the uncontroverted testimony of Mr. Kelly that it was left blank for the purpose of being filled in on the date that the last signature was obtained, which was July 17th. Had the instrument been dated the 13th, it would then have related back to that time, but such was not the case.

3. There is practically no controversy as to this issue, and the evidence abundantly shows that proper tender was duly made to defendants and a deed demanded in accordance with the provisions of the option, which they refused to execute.

4. We further concur with the chancellor in holding that complainants were not entitled to a specific performance of the first option with respect to certain rights not contained in the second option, and the deed based upon same.

Complainant, in taking the second option, expressly reserved all rights under the first option. The situation was this: They held option No. 1, which they considered legal

and binding, but which the defendants insisted was unlawfully executed, and that it had expired before demand was made for a deed. The complainants thereupon procured the execution of option No. 2 at an advance price, and under which the defendants were willing to execute a deed. They had two options on practically the same property, one of which defendants were willing to consummate and the other they were not.

Leaving out of consideration, for the time being, the question of duress, complainants were confronted with two methods of procedure. They could stand on option No. 1 and file their bill for a specific performance, and take the chance of obtaining the property for $10,000, or of losing it entirely (in which event the whole project failed); or they could take a deed under the second option by paying the $25,000, which latter course they pursued, and thereby perfected their title to the entire water course.

In our opinion, when complainants elected to take under the second option, and had the deed executed pursuant thereto, they thereby waived all rights under the first option, and it became merged into said deed. Hence complainants were not entitled to have the first option specifically performed, nor were they entitled to recover damages for its breach, as held by the learned chancellor. The complainants procured the defendants to execute the deed of July 20th, and thereby put it beyond their power to perform the first option, and they should not be permitted to recover damages since complainants made performance of option No. 1 impossible.

5. This brings us to the serious question in the cause, and the one upon which the suit was instituted, viz.: Did the payment of the additional consideration of $15,000 amount, in law, to duress of property?

There can be no question upon this record but that the defendants, in effect, extorted $15,000 from the complainants, or, to state it differently, by taking advantage of the situation, impelled the complainants to pay them that amount over and above what was justly owing. The defendants fixed their own price for their water rights, and no persuasion, deception, or other means was resorted to by complainants to acquire the property at an inadequate price, but they simply asked the defendants to fix their own price, which they did, and which was satisfactory to the complainants. It is quite likely that had Mr. Johnson been so disposed he could have, in the beginning, procured this right from the defendants for $7,500.

In our judgment, the price agreed upon was a full one. The entire property, including the lands and building, consisting of about one hundred acres, was only assessed at $6,000 for the year 1920, and it is a part of the economic history of the State that under the act of 1919 property in the State was assessed around its actual value in 1920. This water had been of no practical benefit to the defendants during the twenty years they had owned this property. Furthermore, Mr. Johnson had agreed to compensate Mr. Ford for procuring other water rights on the creek. The unfortunate circumstance in the cause, and the one, in our judgment, that brought about a feeling of dissatisfaction upon the part of Mr. and Mrs. Ford, was the information divulged to them by Mr. Dobyns on the night of July 14th, that Kinchelow was to receive for his water rights $24,000, and this is what caused the defendants to decline to comply with their contract. No other explanation of their declination is found in the record. They do not contend that $10,000 was inadequate only in

proportion to what was paid Kinchelow. The record showed that Kinchelow had a four-story stone flour and grist mill on said creek that was worth about $10,000, which would be practically destroyed by virtue of his power being taken away by the diversion of this water, and Mr. Johnson testified that he undertook to reason with Mr. and Mrs. Ford and explained to them that the Kinchelow right was more valuable, but they could not see it, and, being thus dissatisfied, and believing that, had they asked more, they would have received more, they began devising some means by which they could compel the complainants to pay them more, and they succeeded in obtaining from the complainants for their water rights $15,000 more than provided by the contract. It was a case of greed, and all they were after was more money, and in this situation they deliberately and flagrantly breached both the letter and the spirit of their contract. The complainant company had contracted to purchase a large tract of land for the gelatin plant at a cost of $55,000; it had expended $40,000 in purchasing other water rights; ground had been staked off for the gelatin plant; wells had been drilled; houses had been secured for laborers; agents had been sent out over the country to employ laborers for construction, and a railroad one-half mile in length had been built to the proposed site. The complainants had purchased a lot of material, and made their plans to go ahead with the construction of the plant. Up to this time they had expended and obligated themselves in excess of $100,000.

The defendants, instead of being ignorant country folk, displayed a remarkable sagacity, and by declining to execute a deed under option No. 1 put the complainants in a situation where they had either to abandon their project

146 Tenn.—6

for at least one or two years (they having been advised by counsel that it would take from one to two years to have their rights under option No. 1 finally adjudicated), if not altogether, or to pay the defendants an additional sum of $15,000.

As to why the complainants paid the $15,000 Mr. Wilcox, the treasurer of the company, testified as follows:

"We were confronted with the question of facing an injunction, as we understood it, if we proceeded with the water supply on the basis of the first option obtained from Mr. Ford. We understood that we could proceed with the construction of the gelatin plant, but an injunction would be granted which would prevent our getting a water supply from a water supply system in Kendrick's creek, which might hold up the manufacture of gelatin for possibly a year and a half, and at that time the way business was it was absolutely necessary for the Eastman Kodak Company to have gelatin from the Kingsport plant during the year of 1921, and we were faced with the decision of either paying the additional amount or abandoning the gelatin plant entirely. It was decided that in view of the magnitude and importance of the work that we could not afford to take the risk of an injunction holding us up by withholding the payment of $15,000."

It is true that the complainants purchased the other water rights after they were notified by Mr. and Mrs. Ford that they would not convey. The situation was this: All of their options were about to expire, and they either had to purchase said water rights or entirely abandon their project. It would have been a useless procedure to have litigated with defendants even successfully as to option No. 1 when their claims to the other interests had been

lost. By such a procedure they would have gained nothing. The defendants were shrewd enough to take in the situation, and thus force the complainants to pay the additional $15,000. The complainants had the right to assume that the defendants, when called upon, and upon the money being tendered, would comply with their contract, notwithstanding their declaration to the contrary before demand was made.

"Refusal of the optionor to perform, before any demand is made on him by the optionee, is not a renunciation of the option so as to determine the optionee's rights where the option is based on a valid consideration." James on Option Contracts, section 706, p. 273; *Mier v. Hadden*, 148 Mich., 488, 111 N. W., 1040, 118 Am. St. Rep., 586, 12 Ann. Cas., 88.

"As a general statement, the breach may consist of an attempted, but unauthorized, withdrawal of the option privilege, the repudiation of the contract, or any other positive and unequivocal act which discloses a present fixed intention on the part of the optionor not to keep and perform his covenant to convey. These are classed as withdrawal or revocation, and repudiation or renunciation, and upon taking place before the expiration of the option time limit, the optionee has the right to treat the option as discharged. But it is optional with the optionee so to treat it, or to hold the optionor to performance, in accordance with the rule that each party to a contract has the right to maintain the contract relation up to the time performance is due, and that, consequently, the optionor, in the case noted, cannot anticipate a breach which will bind the optionee unless the latter elects to treat it as a breach.

"Breach of the option contract by the optionor during its time limit does not therefore affect the right of the optionee to elect after the breach and during the time limit." James on Option Contracts, sec. 702, p. 260; *Mier* v. *Hadden,* 148 Mich., 488, 111 N. W., 1040, 118 Am. St. Rep., 586, 12 Ann. Cas., 88.

"A majority of the courts have reached the conclusion that a renunciation which amounts to a refusal to perform the contract at any time gives the adverse party an option to treat the contract as broken, and to sue immediately, notwithstanding the fact that under the terms of the contract the time for performance has not yet arrived. .

"The promisee, if he pleases, may treat the notice of intention as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance; but in that case he keeps the contract alive for the benefit of the other party as well as his own.

"Ordinarily the party who is willing to abide by an executory contract may treat it as subsisting up to the time when performance should commence, for the purpose of insisting that the other party, who has previously repudiated it, shall then and finally determine whether he will comply with its terms, or persist in his resolution not to perform upon his part."

"Ruling Case Law, sec. 385, p. 1024 and 1026.

We are further of the opinion that the defendants are not in a position to interpose this defense, since they brought about this situation by their wrongful act. Furthermore, the complainants had obligated themselves for the $55,000 tract of land before notice of renunciation was given them by defendants.

Upon the foregoing facts, we are of the opinion that the defendants did coerce the complainants into paying them $25,000 for what they had agreed to sell them for $10,000, as that term is used in cases of this character. There is no escape from the proposition that the defendants, and especially J. D. Ford, encouraged and aided the complainants in this project and caused them to expend large sums of money and assume extensive obligations upon their promise to convey their interest for $10,000; and after the complainants had thus involved themselves, and after every right had been acquired and the chain completed, except the Ford interest, and after demand was duly made, the defendants refused to comply, and thus placed the complainants in the attitude where they had to pay the additional $15,000. Complainants immediately filed this bill to recover said sum, and the record shows that this course was agreed upon by counsel for complainants before the money was paid. Everything would have worked out perfectly but for the failure of defendants to comply with their contract. It is true that the plant was not constructed as contemplated, but this was due to the general business depression of the country, beginning in the late summer or the early fall of 1920.

From the authorities, there appear to be two kinds of duress of which a court of equity will take cognizance, viz., duress of person and duress of property, and the distinction between the two appears from some of the cases to which we will now refer.

In the Nebraska case of *First National Bank* v. *Sargeant,* decided in the year 1902, 65 Neb., 594, 91 N. W., 595, 59 L. R. A., 296, it appeared that Sargeant, the plaintiff, had conveyed by a warranty deed, absolute in form, to the de-

fendant bank certain real estate as security for his indebtedness. Sargeant was in financial distress, and had no means of meeting his indebtedness save by a sale of the real estate. The bank thereafter assumed to be the absolute owner of the property, and by injunction proceedings sought to dispossess Sargeant of a portion of the same. Sargeant procured a purchaser at an advantageous price and endeavored to adjust his differences with the bank so as to effectuate a sale of the property. The bank, however, refused to consent to the sale or to straighten the matter out without the payment by Sargeant of a large sum of money in excess of the amount due. Sargeant met the unjust demand of the bank, and the court permitted him to recover.

The court, in discussing the question now under consideration, said:

"On the question of what is required to constitute duress, the court instructed the jury as follows: ' "Duress" may be defined as an unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination.' This instruction is complained of as erroneous. It is said that the instruction should have told the jury that the will must be 'overpowered,' or the injured party 'bereft of the quality of mind essential to the making of a contract.' We think, under the issues and the character of the duress complained of, the instruction is a fair presentation of the meaning of the word, and that no error was committed such as is complained of. 'Duress,' it is said, 'exists when one, by the unlawful act of another, is induced to make a contract or perform some other act un-

der circumstances which deprives him of the exercise of free will.' *Hackley* v. *Headley,* 45 Mich., 569, 8 N. W., 511. It is obvious that, if the act is done contrary to the will and inclination of the injured party, it cannot be the exercise of his free will. His will is subjected to that of another, 'and he is compelled to yield and submit to an illegal exaction because of the dominant power. In *Parmentier* v. *Pater,* 13 Or., 121, 9 Pac., 59, it is said that to constitute duress by threats 'it is sufficient that they do in fact compel the person threatened to do an act which otherwise he would not have done.' Ordinarily it may be said duress is that degree of constraint or danger either actually inflicted or threatened and impending, sufficient to overcome the mind and will of a person of ordinary firmness. *Brown* v. *Pierce,* 7 Wall., 214, 19 L. Ed., 136; *Baker* v. *Morton,* 12 Wall., 157, 20 L. Ed., 264; *French* v. *Shoemaker,* 14 Wall., 322, 20 L. Ed., 856; *United States* v. *Huckabee,* 16 Wall., 431, 21 L. Ed., 464; 1 Chitty, Contr., 11 Am. Ed., 269; 2 Greenl. Ev., section 301, 302; 1 Wharton, Cont. Pref. IV; 2 Wharton, Ev., section 931 1099; 1 Story, Eq., section 239; 2 Pom. Eq. Jur., section 950. The instruction comes fairly within the rule, and the exception thereto is not well taken."

The court further said: "The duress complained of rests, we apprehend, in the unfortunate financial condition in which the plaintiff found himself, coupled with the control over the legal title to the land and apparent ownership thereof which the bank had acquired, and its power to prevent a voluntary disposal by the plaintiff to meet his just indebtedness without first obtaining the consent of the bank and complying with such demands as it might impose as a condition of releasing its interest and title to the prop-

erty. The duress relied on as grounds of relief, if exist-
ing, consisted not so much in threats against the defendant
or duress of his person as it did in a wrongful and unjust
exercise of control and ownership of the property of the
plaintiff being the real estate to which it held title appar-
ently in fee simple, and the right of disposal on any terms
it saw fit to impose, or of withholding the land from sale
altogether, until compelled to act by a final decree in a
proper suit brought to try and determine the rights of the
respective parties. The case is one of duress of the prop-
erty of an individual, rather than duress of his person. The
ancient doctrine of duress applied only to duress of the
person, such as amounted to a reasonable apprehension of
imminent danger to life, limb, or liberty, which was in
law deemed sufficient to avoid a contract or enable the in-
jured party to recover back money when so paid. The
law, however, has progressed and gradually extended the
doctrine so as to recognize duress of property as a species
of moral duress which might equally with duress of the
person constitute a defense to a contract induced thereby,
or entitle a party to recover money paid under its influence.
The rule is that when such pressure or constraint is
brought to bear as will compel a man to go against his
will, and takes away his free agency, destroying the power
of refusing to comply with the unjust demand of another,
this will constitute legal duress, regardless of manifesta-
tions or apprehension of physical force. It is held in
*Joannin* v. *Ogilvie,* 49 Minn., 564, 16 L. R. A., 376, 52 N. W.,
217: 'There may be duress with respect to real property,
as well as personal, so as to render a payment on ac-
count of it involuntary, so that the money (so paid) may
be recovered back.' In that case it appears a mechanic's

lien was filed against property upon an unfounded claim which the owner paid under protest in order to clear the title of record so that he might consummate a loan on the property which he had negotiated in order to raise money to pay a prior overdue mortgage and other pressing debts, he having no other available means of raising the money. The payment under the circumstances was held to be in consequence of duress of property, and that an action would lie for its recovery. Says the author of the opinion: 'He was so situated that he could neither go backward nor forward. He had practically no choice but to submit to plaintiffs' demand. Had it been goods and chattels which plaintiffs had withheld under like circumstances, there would be no doubt, under the doctrine in *Fargusson* v. *Winslow,* 34 Minn., 384, 25 N. W., 942, but that the payment would be held to have been made under duress. But, while filing the lien did not interfere with defendant's possession of the land, yet it as effectually deprived him of the use of it for the purposes for which he needed it as would withholding the possession of chattel property. It has been sometimes said that there can be no such thing as duress with respect to real property, so as to render a payment of money on account of it involuntary. But this is not sustained by either principle or authority. In view of the immovable character of real property, duress with respect to it is not likely to occur as often as with respect to goods and chattels. But the question in all cases is, Was the payment voluntary? And for the purpose of determining that question there is no difference whether the duress be of goods and chattels, or of real property, or of the person. *Fraser* v. *Pendlebury,* 31 L. J. C. P. N. S., 1; *Pemberton* v. *Williams,* 87 Ill., 15;

*Close* v. *Phipps,* 7 Mann. & G., 586; *White* v. *Heylman,* 34 Pa., 142; *State ex rel. McCurdy* v. *Nelson,* 41 Minn., 24, 4 L. R. A., 300, 42 N. W., 548.' These remarks are very pertinent, and apply with equal force to the situation of the plaintiff in the case at bar. Another case, which seems apropos to the one at bar, was decided by the supreme court of Wisconsin in *Guetzkow Bros. Co.* v. *Breese,* 96 Wis., 591, 72 N. W., 45. In that case a lessor refused to join his lessee in executing proofs of loss after fire had destroyed the leased property and indorse drafts payable to them jointly, unless the lessee paid him a sum of money he did not owe. The condition of the lessee's business was such that he was compelled to have the insurance money without prolonged delay, and he thereupon paid the lessor his unlawful exaction. Afterwards the lessee brought suit to recover the money thus paid as having been paid under duress, recovered judgment, and the action was sustained.

"The authorities are abundant to the effect that where goods or other property is in possession of one not the owner, who refuses to deliver such property to the owner unless the latter pays him a sum not rightfully due, and the owner in order to obtain possession of his property pays the unlawful exaction, a payment so made is in a legal sense under duress, and may be recovered back in a proper action; and especially is such the case where the wrongful detention is connected with circumstances of hardship or serious inconvenience to the owner. *Chase* v. *Dwinal,* 7 Me., 134, 20 Am. Dec., 352; *Mays* v. *Cincinnati,* 1 Ohio St., 268; *Adams* v. *Schiffer,* 11 Colo., 15, 17 Pac., 21; *Chamberlain* v. *Reed,* 13 Me. 357, 29 Am. Dec., 506; *White* v. *Heylman,* 34 Pa., 142; *Crawford* v. *Cato,* 22 Ga., 594; *Central Bank* v. *Copeland,* 18 Md., 305, 81 Am. Dec., 597; *Scholey* v. *Mumford,* 60 N. Y., 498.

"In a very early case (*Astley* v. *Reynolds,* 2 Strange, 915) the plaintiff pawned plate to the defendant as a pledge for the payment of a sum of money loaned. When desiring to redeem, the defendant demanded and was paid a large sum of money in excess of the amount loaned, with legal interest. Suit was brought to recover the surplus above legal interest. The court of the King's Bench says: 'We think, also, that this is a payment by compulsion. The plaintiff might have such an immediate want of his goods that an action of trover would not do his business. Where the rule *volenti non fit injuria* is applied, it must be where the party had his freedom of exercising his will, which this man had not. We must take it he paid the money relying on his legal remedy to get it back.'

"In other cases it is said, in order to constitute duress, 'There must be some actual or threatened exercise of power possessed, or supposed to be possessed, by the party exacting or receiving the payment over the person or property of the party making the payment, from which the latter has no other means of immediate relief than by advancing the money. *Brumagin* v. *Tillinghast,* 18 Cal., 265, 79 Am. Dec., 176; Radich 1. Hutchins, 95 U. S., 210, 24 L. Ed., 409. In 6 Am. & Eng. Enc. Law, p. 84, with respect to the relations existing between mortgagees and mortgagors, the rule as to payment under duress is stated as follows: 'If a mortgagee of land who is in possession for condition broken requires that the mortgagor or his assignee pay more than is legally due in order to redeem, and it is paid accordingly for the purpose of preventing a foreclosure, it is such a compulsory payment as entitles the party who so pays to recover it back.' In support of the text is cited *Cazenove* v. *Cutler,* 4 Met., 246; *Fraser* v. *Pendlebury,* 31

L. J. C. P. N. S., 1; *Bennett* v. *Healey,* 6 Minn., 240, Gil., 158; *Freeman* v. *Etter,* 21 Minn., 3; *McMurtrie* v. *Keenan,* 109 Mass., 185."

The doctrine of duress of property, in its modern application, is well covered by a note in Ann. Cas. 1918B, page 516 et seq., from which the following quotations are taken:

"The actual or threatened exercise of power possessed or believed to be possessed by a private person, over the person or property of another who is thereby rendered apprehensive of injury to his business interests, and has no other means of immediate relief than by making a demanded payment, will ordinarily render the payment involuntary. *Rowland* v. *Watson,* 4 Cal. App., 476, 88 Pac., 495; *Carew* v. *Rutherford,* 106 Mass., 1, 8 Am. Rep., 287; *Matthews* v. *Williams Brewing Co.,* 26 Misc., 46, 25 N. Y. S., 241; *Kamenitsky* v. *Corcoran,* 97 Misc., 384, 161 N. Y. S., 756; *Newland* v. *Buncombe Turnpike Co.,* 26 N. C., 372; *Redford* v. *Weller,* 27 S. D., 334, 131 N. W., 296. See, also, *Rees* v. *Schmits,* 164 Ill. App., 250; *Hackley* v. *Headley,* 45 Mich., 569, 8 N. W., 511.

"Where such duress is exerted under circumstances sufficient to influence the apprehensions and conduct of a prudent business man, payment of money wrongfully induced thereby ought not to be regarded as voluntary. *Burke* v. *Gould,* 105 Cal., 277, 38 Pac., 733.

" 'Moral duress consists in imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another; the theory under which relief is granted being that the party profiting thereby has received money, property or other advantage, which in equity and good con-

science he ought not to be permitted to retain.' *Rees* v. *Schmits*, 164 Ill. App., 250. . . .

"So in *Carew* v. *Rutherford*, 106 Mass., 1, 8 Am. Rep., 287, wherein it appeared that a labor organization threatened the plaintiff, who was an employer of labor, with taking away a number of his working people and deterring others from entering his employ unless he paid them a sum of money, it was held that the payment when made by the plaintiff, who was reasonably apprehensive of an injury to his business, was made under duress.

"In *Newland* v. *Buncombe Turnpike Co.*, 26 N. C., 372, a payment by the plaintiff, who had contracted to carry the public mail, of tolls illegally exacted by the defendant turnpike company, which threatened to close the gates against the plaintiff unless he paid the tolls, was held to have been made under duress. . . .

"In *Rowland* v. *Watson*, 4 Cal. App., 476, 88 Pac., 495, it appeared that the plaintiff paid a sum far in excess of what was due from him to the defendant, who knew of the plaintiff's distress, and who declined to release his lien unless he was paid the excessive amount demanded. A failure to pay would have forced the plaintiff into bankruptcy. It was held that the payment could be recovered back. . . .

"In *Brown* v. *Worthington*, 162 Mo. App., 508, 142 S. W., 1082, it appeared that the plaintiff was given an option to buy a quantity of hogs at a stipulated price. Before the time within which he might exercise the option expired, the plaintiff entered into a contract with a third person for the resale of the hogs in question, after which the plaintiff tendered the amount agreed on, which the defendant declined to accept, and demanded $1,500 in excess of the

agreed price. Owing to the urgent necessities of the situation, the plaintiff, in order to be able to fulfill his contract with the third party, paid the excessive demand, and sued for such excess on the ground that he paid same under duress and coercion. The court . . . said:

" ' . . . The strictness of the common-law rule touching the matter of duress has been much relaxed in the development of the law. Originally "duress" meant only duress of the person, and nothing short of such duress, amounting to a reasonable apprehension of imminent danger to life, limb or liberty, was sufficient to enable the party to recover back the money paid. Subsequently, in keeping with the principles of equity and good morals, the doctrine was extended so as to recognize duress of property as a sort of moral duress, which might, equally with the duress of the person, entitle the party to recover back money paid under its influence. . . .

" 'Under this view, it is said the real and ultimate fact to be determined in every case is whether or not the party paying the money really had a choice, that is, whether he had his freedom of exercising his will. Numerous authorities declare that if one is compelled by business necessity to surrender to the constraint involved in the unlawful demand and make the payment, moral duress appears. In other words, in such circumstances, it may be found as a fact that the party paying has not had his freedom of exercising his will and paid the money under moral duress, in which event, if it is against equity and good conscience for the money to be withheld from plaintiff, it may be recovered.' "

In the case of *Lonergan et al.* v. *Marcus B. Buford et al.*, 148 U. S., 581, 13 Sup. Ct., 684, 37 L. Ed., 569, the plain-

tiffs had contracted to purchase a lot of cattle from the defendants, but the cattle had never been delivered, nor had the title passed. It was insisted by the defendants that the plaintiffs (speaking in round numbers) owed them a balance of $14,000. The defendants declined to deliver the cattle until the $14,000 was paid. Plaintiffs thereupon paid the $14,000, obtained possession of the cattle, and brought suit to recover the $14,000 paid under duress of property. Mr. Justice BREWER, in delivering the opinion of the court, said:

"Finally, it is objected that the last payment was voluntary, and therefore cannot be recovered, either in whole or in part, although it was in terms made under protest. It appears from the testimony that the defendants refused to deliver any of the property without full payment. This was at the commencement of the winter. The plaintiffs had already paid $175,500, and without payment of the balance they could not get possession of the property, and it might be exposed to great loss unless properly cared for during the winter season. Under those circumstances, we think the payment was one under duress. It was apparently the only way in which possession could be obtained, except at the end of a lawsuit, and in the meantime the property was in danger of loss or destruction."

In the instant cause there was no duress of person, but there was duress of property. The complainants had involved themselves to the extent of many thousands of dollars. Under existing conditions it was imperative that the plant be constructed immediately. The obligations were incurred upon the faith of defendants' promise to convey their water rights for $10,000. Complainants called upon defendants to perform, and they declined, but stated that

they would convey for $25,000. The complainants were in a position where they had to pay the $25,000, or lose what they had expended and contracted to expend. They were thus forced against their will to pay $25,000. It was an involuntary payment made necessary by the fraud and bad faith of the defendants. To permit the defendants to escape in the circumstances would be to condone their wrongdoing, and permit them to profit by their own inequity. By decreeing to complainants the $15,000, we would not be taking anything from the defendants that rightfully belonged to them. They would still have the $10,000 which they fixed as a maximum price for their water rights.

We have examined the cases relied upon by the defendants, and none of them support their theory, or, at least, they can be distinguished from those cited hereinabove.

It is also insisted on behalf of the defendants that the demand of the complainants is in the nature of a rescission, and that complainants cannot rescind in part, but this is a misconception of the theory of the bill. The complainants are not seeking a rescission. They are simply undertaking to recover $15,000, which they allege the defendants obtained from them by duress of property. If it were necessary to return the property, then complainants would not have accomplished anything by meeting the unjust demand, and when money is thus unjustly obtained from them, they have no remedy, but must submit to the duress.

It will be noted in the cases set forth hereinabove, in support of the duress of property rule, that it was not required that the property be returned, and to require the property to be returned would be to reject the rule.

It is also insisted that the duress only existed at the time when the second option was obtained, and not at the time of the execution of the deed pursuant thereto.

To this we cannot assent. It was, in effect, one transaction. The deed was based upon the option; the duress was continuing, and without the payment of the $25,000 the deed would not have been delivered.

6. The complainants assign as error the failure of the chancellor to decree treble damages against J. D. Ford under section 3193a8 .of Shannon's Code, upon the theory that he induced his wife and daughter to breach the contract.

While there are a number of circumstances in the record which lead us to believe that J. D. Ford did not act in good faith in this matter, yet we are unable to say that the preponderance of the evidence shows that he procured his wife and daughter to violate this contract within the spirit and meaning of the statute.

7. As to the cross-bill, by which the defendants undertook to have the deed of August 20th canceled for the reason that they did not hold such title as they could convey, we are of the opinion that the chancellor properly sustained the demurrer, which questioned the right of the defendants to attack their title. The allegations of the cross-bill, so far as the facts are concerned upon this issue, are as follows:

"Cross-complainants would respectfully show that, at the time when they were negotiating for the sale of the property rights now claimed by the cross-defendants, they were uncertain as to their title, or as to what rights, title, and interest they had in the said land, being under the impression that the land was entailed, and that they could not make a good sale and conveyance of same, and mentioned the matter to Mr. Kelly, the attorney for the cross-defendants, who said they could convey good title by the usual

covenants of seizin, possession against incumbrances, and general warranty; that is to say that they could make a good and sufficient deed, absolute in fee simple, by which all the rights and interests in the property would pass in fee forever to the cross-defendants.

"Cross-complainants also aver that they made other inquiries with regard to said title, and were led to believe that they could make such a deed as Mr. Kelly informed them they could make, and, being under the impression that they could so convey the property, and Mr. Johnson, after having taken the second option, requested of them to execute the same by making the deed in fee, they did so."

From the cross-bill it thus appears that the defendants asked Mr. Kelly, counsel for the complainants, for his opinion as to their title, and to which he responded, but they were not satisfied with his opinion, and did not act upon same, but, according to the allegations of the cross-bill, made other inquiries as to the title, and the inference is deducible that it was the information so obtained that satisfied them as to the title, and this is not a case where the deed was procured upon the false representations of the complainant.

The general rule as to one being estopped to question his title is thus stated in 21 Corpus Juris, 1067, as follows:

"A person who assumes to convey an estate by deed is estopped, as against the grantee, to assert anything in derogation of the deed. He will not be heard, for the purpose of defeating the title of the grantee, to say that at the time of the conveyance he had no title, or that none passed by the deed, nor can he deny to the deed its full operation and effect as a conveyance."

Johnson v. Ford.

Our own decisions upon the question, and which substan-tially support the above text, are as follows: *Gill v. Mc-Kinney,* 140 Tenn., 549, 205 S. W., 416; *Ferguson* v. *Prince,* 136 Tenn., 548, 190 S. W., 548; *Mengel Box Co.* v. *Ferguson,* 12 Tenn., 443, 137 S. W., 101; *Ruffin* v. *Johnson,* 5 Heisk., 608; *Rogers* v. *Cawood,* 1 Swan, 142, 55 Am. Dec., 729; *Wilson v. Bass,* 6 Tenn. (5 Hayw.), 110; *Moseley* v. *Stewart* (Tenn. Ch. App.), 52 S. W., 671.

It thus appears that the cross-complainants, before con-veying this water right, had their title duly investigated, and they were perfectly willing to convey title thereto with warranties after such investigation upon receiving the $25,-000, and it was only when the complainants sought to re-cover the $15,000 paid under duress of property that the defendants undertook to question their title. And we are of the opinion that they should be held estopped to question their title in the circumstances, and we are further of the opinion that this cause does not fall within the decision of this court in *Spurlock* v. *Brown,* 91 Tenn., 260, 18 S. W., 868.

Upon the whole, we are of the opinion that the chancel-lor reached the right result in this cause, and it results that his decree, in its result, for the reasons set forth in this opinion, will be affirmed, with costs.